Argued September 25; affirmed October 15, 1946

# STATE *v.* PEPPIE
(173 P. (2d) 468)

GEORGE R. DUNCAN, Judge.

*Bruce Spaulding,* of Salem (with Peery T. Buren and Paul R. Hendricks, both of Salem, on brief), for appellant.

*M. B. Hayden,* District Attorney, of Salem, for respondent.

Before BELT, Chief Justice, and ROSSMAN, KELLY, BAILEY, BRAND and HAY, Justices.

KELLY, J.

The defendant, Fred Peppie, was convicted of the crime of assault with intent to commit rape and from the resulting judgment of imprisonment in the penitentiary, appeals.

The undisputed facts are that on the early morning of October 26th, 1945, defendant and the prosecutrix met near a restaurant in the Hollywood District in Salem, known to this record as the Black and White; that prosecutrix was employed as a waitress in that restaurant and at about one o'clock a. m. of the day named, was waiting outside of the restaurant. Her sixteenth birthday was upon January 22, 1945. Defendant was thirty-seven years old.

534

. To correctly reflect the story told by the prosecu-
trix, we quote from the record of her testimony as
follows:

"Q  Now, will you describe to the court and
jury just where or when you left this cafe,  *  *  *
A  Well, I walked to my right a little bit and then
I turned and walked to my left and stood there for
a few minutes.

Q  Now, how far would you estimate or say you
were from the corner of this Black and White cafe?
A  Oh, about 20 steps, something like that.

Q  Now, was it light or dark at that time?
A  It was dark.

Q  Now, what happened to you, if anything?
A  Well, I went to look at my watch and it was
awfully dark and I thought, 'Well, I better go back,'
and just then somebody grabbed me from behind
and put their hand over my mouth and started
dragging me in back of the Black and White by the
cabin gate.

Q  At that time did you know who it was?
A  No, I did not. Not until he had got me in the
cabin.

Q  And where were you taken, do you know?
A  He took me into a cabin.

Q  Well, now do you know what cabin it was?
A  Well, it was a cabin with a clock on the top
of it.

Q  Now, when you arrived at the door was the
door open at all.
A  No, the door was not open.

Q  Was it eventually open?
A  Yes, it was and he took me inside.
*  *  *

Q  When did you first know who your assailant
was? By that, did you know it before you got into
the door or did you know it inside?
A  I didn't know it until after we got inside.

Q Was there a light in the cabin?

A Yes, there was a light on.

Q All right. Now, after you got inside, what happened?

A Well, he started pulling me and pushing me around and I asked him what he pulled me in there for, and he told me to shut up and started hitting me and pulled my hair and he threw me on the floor, and we fought around a long time. He took my coat off from me and he threw me on the bed and told me to shut up, and I started to scream several times and he told me to shut up and by that time I was so scared I couldn't scream, and I could hardly talk and he threw me over - - - - (Interruption by a colloquy between court and counsel.)

\* \* \*

"The Court: Yes, just tell what was done and what was said. Don't tell what your thoughts were necessarily.

\* \* \*

The Witness: Then he turned me over on my face and he got up and took one arm in back of me and then he got the other one and started unbuttoning my dress. My dress is twopiece with buttons down the back. He turned me over and got that off of me. I told him to leave me alone and he told me to shut up, and he started to take off my slip, and then my shoes, and I didn't have any stockings on. I hadn't worn them to work that day, and he took my slip off of me and then he took off his clothes, and then when he had taken off his clothes he came over and got on to the bed and kissed me, and I tried to keep him from it, and I couldn't and then he told me to stay where I was at and he started to go in the restroom. There was two coke bottles and a whiskey bottle on the dresser close to the restroom. When he started in there I started to get up and he threw the coke bottle at me, and I jumped up from the end of the bed and pushed open the door and I ran over to the Edwards' cabin and started yelling, 'Help, help'."

The prosecutrix also testified that defendant told her he intended to rape her and he put a knife at her throat.

She further testified that after getting out of the cabin she ran to the Edwards' cabin and the defendant pursued her, and, as she was pushing against the door of the Edwards' cabin, the defendant was behind her, had hold of her throat and was pulling against her; and when Mr. and Mrs. Edwards opened the door, defendant turned and ran back to his cabin.

Mrs. Ida A. Parsons, of Phoenix, Oregon, a daughter of Mrs. Edwards, as witness for the state, testified on direct examination, as follows:

"Q Now, Mrs. Parsons, did you have occasion on the night of the 26th of October, 1945, along about 1 o'clock in the morning, or some time thereabouts, to go to the Hollywood Cabin Motel which is located out here north of town?

A Yes, we had just arrived there.

Q Did you see anything out of the ordinary there when you drove up to this motel?

\* \* \*

A Yes, I did see something out of the ordinary.

Q All right. What did you see?

A I saw a young couple entering this cabin over there with the clock, where the clock is. And I saw him just shoving her along. I didn't see them until they got in the light of the cabin there. The lights were bright inside and I saw them rush into it. He seemed to just take her into there so hurriedly like and shut the door right quick and this is all that I saw.

Q Did this man have hold of this girl or woman?

A Yes, he did."

Mrs. Mollie Reed, of Medford, testified that, during the early morning of October 26, 1945, with her husband,

daughter and mother-in-law, she had occasion to call upon Mr. and Mrs. Edwards, to whom she is related. We quote from her direct examination:

"Q Well, what did you see that was unusual?

A Well, he was pushing that girl in, or whatever she was.

Q What was that?

A Trying to shove or push her in.

Q Was it a girl and a man?

A Yes, a man and woman.

Q Was it near this cabin that had a clock on it?

A Yes sir."

Mrs. Elizabeth A. Edwards testified that she and her husband resided at the Hollywood Auto Court; that in the early morning of the alleged crime, they were awakened by a call for help in a loud and frantic voice; that she went to the door. We quote from Mrs. Edwards' direct examination:

"Q And what did you discover there at the door, if anything?

A By the time I unlocked the door, there wasn't any one right at the door as I opened it, but just a little distance from it, why I saw a girl and a fellow sort of leaving the door and it seems as if he was dragging her from behind. I mean that he had hold of her from the back. Holding both arms.

\* \* \*

Q How were they attired, if at all? How were they—what was their condition as to clothing?

A Well, they were practically nude, except that she had on panties and a brassiere and he had on shorts.

Q Did this man release her after you came to the door?

A Yes, as soon as I opened the door and stepped out, why he released her and left.

\* \* \*

Q Did he walk away or go away hurriedly?
A He went away hurriedly."

Both Mr. and Mrs. Edwards testified to accompanying prosecutrix to defendant's cabin and there procuring the clothing of prosecutrix; and that they took prosecutrix to her home.

Defendant testified that he had an appointment to meet another girl at nine o'clock in the evening immediately preceding his affair with the prosecutrix, but the girl failed to keep the appointment at nine o'clock. He then secured another appointment for two o'clock "to meet this girl". He was to meet her as she got off the bus from Camp Adair.

About nine o'clock in the evening of October 26th, according to his testimony, defendant went to the Black and White restaurant, and while there, as he was paying his bill, the prosecutrix wanted to know of him if he was going to meet her at one o'clock for sure. We quote from an answer he made on direct examination:

"* * * She (prosecutrix) has asked me that two or three times. I figure that was about the third time she asked me that, so having nothing to do until 2 o'clock I figured, yes, I would meet her at 1 o'clock after she got off work."

Defendant then testified that he had rented the cabin referred to here in the afternoon of the 26th of October.

After leaving the Black and White Cafe at about nine o'clock in the evening of October 26th, defendant had a couple of drinks of whiskey with a friend. At about twelve o'clock midnight, defendant returned to the Black and White restaurant, but did not enter it. Then he returned to his cabin and remained there about

a half hour when he again went to the Black and White restaurant, staying on the corner waiting for prosecutrix.

We quote from defendant's direct examination:

"Q  Well, now, just tell the jury in your own words what occurred at about 1 o'clock.

A  Well, at 1 o'clock I was waiting there on the corner and she come out walked right up to the corner where the drugstore is. That is north of where she worked. I waited there and we walked up that street and there is a fence in that street with a gate in it that leads into the courts and we walked into the courts through that gate.

Q  Just a minute, I want you to say everything that happened when you met her? What did you say and what she said and where you were and all about it?

"A  I said, 'Hello' and she says, 'Hello', and she asked me if I was going to take her home, and I said I would take her home, so we were walking up this street at the time we were talking having this conversation, so we went through the gate in the fence. She didn't ask where she was going or what was happening or anything and walked over to where my court is, the motel that I rented there. The lights all lit up around there in different courts. So I opened the door and they say I dragged her, but I didn't do it. I either had hold of her hand or had her by the arm holding her arm assisting her. As we got inside the cabin I asked her if she was going to give me a kiss, so she ran up and threw her arms around me and about two or three minutes just stayed there, so she sat down in a chair and I went over and asked her if she cared for a drink. All this time I am figuring that I didn't know she was as young as she was. She told me she was nineteen all the time.

Q  When had she told you she was nineteen?

A  Well, at the time I met her down town, met her on the bus.

Q  Go ahead and tell the jury what happened.

A  So we were inside the cabin there and I asked her about taking her coat off, so I lifted her coat off and hung it up on a hanger and hung it upon a window of the cabin. There is a strip there that holds up the shades or the curtains. I hung her hanger up there with her coat on, and at this time she was sitting down and she said she was afraid because her sister lived around there. Sister and brother-in-law, and so I sat down on the bed and asked her if she wanted a drink. I had a drink in my hand and she said, 'no', she didn't drink. I asked her if she wanted a cigarette and she said 'no'. So after all that was happened, why, she come over and sat on the bed and I put my hand in back and started taking her dress and helping her with her dress off, and she put her hand back there and started helping me unbutton them in the back, and she was on the bed and she had a zipper in her skirt, and it was already open and I started lifting her slip off and she said, 'It don't come off that way'. I started pulling it down, and she said, 'It come off over her head,' and all she had on was her brassiere and pants, sitting in the middle of the bed. So I am sitting on the edge of the bed and we were talking and she told me she was married and divorced. The fellow she had married was already - - - had two children and her mother had the marriage annulled and that she was in the family way herself, and I said, 'Well, that is too bad. That is tough. I am sorry for you and everything.' And she started showing me bills that she had to pay, so I offered her ten dollars and I gave her the ten dollars and put it in her purse, and she said 'I shouldn't take this.' And I said, 'Oh, that is all right', and so anyway, I am sitting on the bed and I get up and walk over to the bathroom and pretty soon I heard a lot of commotion and running and jumping and I turned around and saw her run out. Out of the cabin and after she run out I started to run out too, and then I doubled back and got my

clothes, that were on the chair, and my clothes and the purse were on the chair, and so I grabbed those and went out and went home. * * *"

Five assignments of error are presented by defendant.

The first assignment is based upon the testimony of the prosecutrix given after she had said that defendant asserted that he intended to rape her. The purport of the question propounded by the district attorney to the prosecutrix was as follows:

"Q * * * when he (defendant) made this statement to you that he intended to rape you, did he make any statement about having raped other girls?"

After objection had been interposed and the court had ruled that the witness might answer without mentioning any names, the prosecutrix answered in the affirmative.

In support of defendant's first assignment he cites *State v. Wilson*, 113 Or. 450, 230 P. 810, 233 P. 259, 39 A. L. R. 84. In that case the defendant was charged with the crime of manslaughter by causing the death of an unborn child by means of a certain metallic instrument, the use of which was not necessary to preserve the life of the child's mother.

The prosecutrix was allowed to testify, over the objection and exception of defendant, that she became pregnant by him and that he performed two separate and distinct operations upon her resulting in the death of the foetus with which she was at the time pregnant, prior to the one named in the indictment.

*State v. Jensen*, 70 Or. 156, 140 P. 740, is also cited in support of defendant's first assignment. In that

case, over the objection of defendant, the court permitted a witness other than the prosecutrix to tell of an alleged assault by the defendant with an intent to commit rape upon her at a time and place entirely disconnected from the transaction mentioned in the indictment.

In *State v. Start,* 65 Or. 178, 132 P. 512, 46 L. R.A. (N. S.) 266, also cited by defendant, the defendant was charged with the commission of the crime against nature committed with one Rodby. There, the court permitted the state to call several witnesses who testified that they themselves, at other times, had participated with defendant in a like action as that described in the indictment.

In all of these cases, it will be noted that evidence was introduced tending to prove the commission of specific crimes separate and distinct from the crime charged; and on appeal this was held to be error.

In the case at bar only the alleged statement of the defendant was admitted which statement if made at all was made while he was in the act of committing the crime charged in the indictment. As part of the case in chief there was no attempt on the part of the state to prove the commission of any distinct crime. other than the one alleged in the indictment.

■ The introduction of testimony of statements made by the defendant of similar purport to the statement under consideration here has been upheld in the following cases: *State v. Poole,* 161 Or. 481, 488, 90 P. (2d) 472; *State v. Putney,* 110 Or. 634, 642, 224 P. 279. Such statements are considered part of res gestae. No error was committed in permitting the prosecutrix to so testify.

The second assignment is based upon the reception in evidence of an empty coca cola bottle found by the officers in the sink of defendant's cabin.

■ The prosecutrix testified that as she was leaving the cabin, defendant threw an empty "coke" bottle at her. The defendant denied that he had done so; but testified that he had mixed whiskey and coca cola while in the cabin with prosecutrix; that he drank the mixture and offered some of it to the prosecutrix who declined to drink it. If any error was committed in receiving the empty bottle in evidence such error was harmless.

■ The third assignment of error is based upon the admission into evidence after defendant had testified of an exemplified copy of a previous conviction of defendant of the crime of rape upon a plea of guilty. The certification thereof conforms to the requirements of the statute. It is true that the second page thereof consists of a copy of the commitment of defendant to prison at San Quentin; but the judgment itself specifies that defendant shall be there confined.

Defendant cites the case of *Mannix v. Portland Telegram*, 144 Or. 172, 191, 23 P. (2d) 138, 90 A. L. R. 55, in support of this assignment. There, the defendant assigned error in the rejection of the record of the proceedings which had resulted in the disbarment of plaintiff. In the Mannix-Telegram case this court stated that the authorities quite plainly indicate that a party cannot go beyond the fact of disbarment and seek to establish the ground thereof for the purpose of affecting the credibility of the witness. Attention is there called to the provisions of the statute to the effect that a witness may be impeached by the record of a judgment that he has been convicted of a crime, it is held that the limit of that rule is that it can be established by the

judgment of the court that the witness has been convicted of a certain crime when the fact of conviction is not admitted. (Section 4-711, O. C. L. A.) The commitment states no fact not stated in the judgment except the order there given to the sheriff to take, keep and deliver defendant to the warden and the order to the warden of San Quentin to receive and detain the defendant. We think such a recital was not prejudicial to defendant. As we construe the document, it goes no further than to establish the fact of defendant's conviction.

Defendant's fourth assignment is to the effect that the indictment is insufficient to charge the defendant with any crime other than simple assault.

Omitting the title, the list of witnesses, and the official signature of the district attorney, and substituting asterisks for the name of the prosecutrix, the indictment is as follows:

"Fred Peppie (sometimes known as Fred Pepe) on the 26th day of October A. D. 1945 in the county of Marion and State of Oregon then and there being a male person over the age of 16 years, he the said defendant did then and there unlawfully and feloniously assault one * * * who was then and there an unmarried female over the age of 16 years, and the said defendant by then and there forcibly and violently, grasping, seizing, assaulting, choking and beating the said * * * with the intent and purpose then and there on the part of him, the said Fred Peppie (sometimes known as Fred Pepe), to then and there unlawfully and feloniously, forcibly ravish and carnally know the said * * * contrary to the Statutes in such cases made and provided, and against the peace and dignity of the State of Oregon.

"Dated at Salem, in the county aforesaid, this 20th day of November, 1945."

■ :Applying the well known statutory and oft repeated canon of construction that if the acts charged as a crime are set forth with sufficient certainty to inform the defendant of the offense and enable a person of common understanding to know what is intended, the indictment is not subject to attack (section 26-714, O. C. L. A., Vol. 3, p. 308; *State v. Coffman*, 171 Or. 166, 169, 136 P. (2d) 687; *State v. Linville*, 127 Or. 565, 568, 273 P. 338; *State v. Lockwood*, 126 Or. 118, 124, 268 P. 1016), we hold that the indictment in the instant case is sufficient to charge defendant with the crime of assault with intent to commit the crime of rape.

By merely striking four words out of the indictment in suit, it would not be subject to the criticism defendant offers. Those four words are, "and the said defendant". That such matter may be treated as surplusage is held in *State v. Pointer*, 106 Or. 589, 592, 213 P. 621; *State v. Rowen*, 104 Or. 1, 200 P. 901; *State v. Parr*, 54 Or. 316, 320, 103 P. 434; *State v. Humphreys*, 43 Or. 44, 70 P. 824; *State v. Lee*, 33 Or. 506, 56 P. 415; *State v. Horne*, 20 Or. 485, 26 P. 665.

We think defendant's fourth assignment is without merit.

In the case of *State v. Castner*, 122 Me. 106, 119 A. 112, the Maine court gave consideration to an indictment which was devoid of surplusage and hence deletion of surplusage therefrom was unavailing.

Defendant's fifth assignment of error asserts that the trial court erred in overruling defendant's amended motion for a new trial.

■ Defendant bases his argument in support of his fifth assignment upon the showing made by his attorney, Mr. Spaulding, in an affidavit accompanying the

defendant's amended motion for a new trial. This affidavit discloses that the district attorney in his closing argument to the jury stated that witnesses Parker and Mr. and Mrs. Edwards had testified that the prosecutrix's clothing was dirty when they saw it after the prosecutrix came to Mr. and Mrs. Edwards for protection. Objection was interposed on the ground that those witnesses had not so testified. The court sustained the objection. In the affidavit, it is stated that thereafter the district attorney stated in the presence of the jury substantially as follows:

"The only reason the officers and Mr. and Mrs. Edwards did not testify that the girl's clothing was dirty was that I forgot to ask them - - - you can blame that on to me."

No counter affidavit was filed and it is argued that this was tantamount to a statement by the district attorney that if the witnesses named had been interrogated thereupon, they would have testified that the clothing removed by defendant from the person of the prosecutrix was dirty when they saw it, thus corroborating the prosecutrix.

This question was presented to the learned trial judge. He had heard what the district attorney did say. He may not have agreed with defendant's counsel as to the purport of the district attorney's statement. In any event, it is too plain for argument that the defendant removed prosecutrix's clothing. He claims that he placed that clothing on the bed. The prosecutrix testified that he threw it on the floor. Whether either the floor or the bed was dirty or clean, the undisputed and shameful fact remains that the thirty-seven-year-old defendant removed the blouse, the skirt and the slip from that sixteen-year-old girl with the purpose

and intent of carnally debauching her. The only disputed question is whether defendant assaulted her in his attempt to carry out his intended sexual gratification.

In passing upon the propriety of the trial judge's course in deciding that it was not necessary to subject this sixteen-year-old girl to the embarrassment of a second trial and impose upon the taxpayers the added expense thereof, we must bear in mind that upon the point last herein considered, he carefully instructed the jury as follows:

> "You have heard the opening statements and the closing arguments of the respective attorneys, *as well as the statements* and objections *made by them from time to time during the course of the trial* and I instruct you that the same are offered only for the purpose of aiding in the conduct of the trial and of more clearly presenting the facts, and the same are not and should not be taken by you as evidence of any fact whatever." (Italics supplied.)

We find no reversible error and, therefore, the judgment of the trial court is affirmed.

---

BELT, C. J., concurring in the result.

Relative to the fifth assignment of error, this court ought not to assume that the trial judge heard anything in addition to that which the record discloses. The record shows without contradiction that the district attorney made the statement as set forth in the opinion of the court. It was clearly error for him to have done so. However, in the light of the entire record, it was not prejudicial. The guilt of the defendant was established beyond a reasonable doubt. I concur in the result.