**Application of Albert Herman LAN-
DEROS For a Writ of Habeas
Corpus.**
No. C 90–57.

United States District Court
D. New Jersey.
June 29, 1957.

Gross, Blumberger, Goldberger &
Stavis, by Morton Stavis, Newark, N. J.,
for petitioner.

H. Russell Morss, Jr., Union County
Prosecutor, by Hyman Isaac, First Asst.
Prosecutor, Elizabeth, N. J., for respond-
ent.

FORMAN, Chief Judge.

This matter arises on an order ob-
tained by the petitioner, Albert Her-
man Landeros, directing the respondent,
George F. Goodman, Warden of the New
Jersey State Prison, Trenton, New Jer-
sey, to show cause why a writ of habeas
corpus should not issue in accordance
with his petition filed herein.

Petitioner was convicted by a jury in
the Union County Court, Law Division,
on October 15, 1954, of the crime of rape.
He was sentenced on January 21, 1955 to
a term of 10 to 12 years. On his appeal
the judgment was affirmed by the New
Jersey Supreme Court, State v. Landeros,
1955, 20 N.J. 76, 118 A.2d 524. Certi-
orari was denied by the United States
Supreme Court, Landeros v New Jersey,
1956, 351 U.S. 966, 76 S.Ct. 1025, 100
L.Ed. 1486. The indictment had charged

him with having had carnal knowledge. of the complaining witness, Lois Stiles, against her will, on the night of January 30, 1953, in Westfield, New Jersey. She gave a description of her assailant to the Westfield police, and subsequently was taken by the police to confront petitioner on two separate occasions, the first time at petitioner's place of employment in Belle Mead, New Jersey, on February 3, 1953, where, though the record is contradictory, it would appear, for all practical purposes, that she did not identify him; and secondly, at the Rahway, New Jersey police headquarters, on March 9, 1953, where petitioner had been brought after being arrested on a charge of assaulting a woman in that city, at which confrontation, petitioner was identified by Lois Stiles as her attacker.

Petitioner alleges that Lois Stiles was unduly influenced by the police in their reference to him as a rapist, and by the circumstances of his confrontation, and that both of these factors resulted in her falsely accusing him of being her attacker. He further alleges that documents in the police files were "widely different" from what they had been represented to be by the prosecution at the jury trial—including a description by Lois Stiles of her assailant which was "entirely contrary to the actual appearance of the petitioner"; that all these things, including "deliberate, willful, and continued suppression (of the evidence) by the police and the prosecution at the trial", and the failure of the Supreme Court of New Jersey to order a retrial, constituted a denial of petitioner's fundamental constitutional rights.

At the outset, it does not pass unnoticed that petitioner, in presenting his petition for a writ of habeas corpus, has failed to exhaust the remedies available to him in the state courts, as required by 28 U.S.C. § 2254,[1] Ex parte Hawk, 1944, 321 U.S. 114, 64 S.Ct. 448, 88 L. Ed. 572. No petition for a writ of habeas corpus has ever been presented by him in the state courts. However, implicit in the assertions made by petitioner in the appeal of his conviction to the New Jersey Supreme Court, State v. Landeros, supra, are the charges of violation of his constitutional right to due process, now before us.

■■ It has been held in this circuit, in U. S. ex rel. Smith v. Baldi, 1951, 192 F.2d 540, that a denial by the United States Supreme Court of an application for a writ of certiorari is, essentially, a denial without prejudice; and the United States Supreme Court, itself, has declared that such denial "carr(ies) no weight in a subsequent federal habeas corpus proceeding", Darr v. Burford, 1950, 339 U.S. 200, 216, 70 S.Ct. 587, 596, 94 L.Ed. 761. Despite this, however, the Supreme Court of the United States did include in its denial of Landeros' application the statement that the denial was made "without prejudice to an application for a writ of habeas corpus in an appropriate United States District Court". In the light of the Court's language, and the fact that the constitutional question had been raised in the appellate proceedings in the New Jersey Supreme Court, I was constrained to hear the petition on its merits, notwithstanding failure to resort to habeas corpus in the New Jersey courts. Consequently, an order to show cause why petitioner should not be granted a writ of habeas corpus was signed on February 4, 1957, and a hearing was held on March 4, 1957.

---

1. "An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254.

In so far as petitioner suggests that his conviction was not supported by the evidence, the petition is one in the nature of an appeal from state court decisions. That a petition for a writ of habeas corpus will not lie as a substitute for an appeal is well established, U. S. ex rel. Brogan v. Martin, 3 Cir., 1956, 238 F.2d 236.

The only question which this court can properly entertain in the instant proceeding, is whether petitioner's constitutional rights have been denied. The points which are at issue, therefore, are whether there has been a suppression of evidence by the prosecution, and if so, whether such suppression was prejudicial to petitioner; and further, whether the circumstances surrounding petitioner's identification by the complaining witness constituted a denial of due process and equal protection of the law.

There is a sufficient body of opinion for the conclusion that suppression of evidence implies elements of willfulness and knowledge amounting to bad faith on the part of the prosecution, or officers of the prosecution.

In Pyle v. Kansas, 1942, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214, the Supreme Court of the United States remanded habeas corpus proceedings to the Supreme Court of Kansas for a determination of the truth of allegations made therein, including that of suppression of evidence, but the Court made "suppression" conjunctive with knowledge by the authorities of the suppression. In that case, 317 U.S. on page 216, 63 S.Ct. on page 178, the Court stated the following:

> "The record of petitioner's conviction, while regular on its face, manifestly does not controvert the charges that perjured evidence was used, and that favorable evidence was suppressed *with the knowledge of the Kansas authorities*. No determination of the verity of these allegations appears to have been made. The case is therefore remanded for further proceedings." (Emphasis supplied.)

It is interesting to note that when the case, under the name of Pyle y. Amrine, was finally disposed of by the Kansas Supreme Court, 1945, 159 Kan. 458, 156 P.2d 509, at page 518 that court said:

> "In the absence of allegations amounting to *bad faith or willful oppression in office* we would be loath to hold that because the prosecuting officers saw fit to present a certain piece of evidence to a jury in one case and decided not to use it in a companion case, the convicted defendant in the first case should be released on a writ of habeas corpus on the ground that evidence favorable to him had been suppressed." (Emphasis supplied).

In Woollomes v. Heinze, 9 Cir., 1952, 198 F.2d 577, 579, the court said:

> "*Deliberate* suppression of evidence may well constitute proper ground for release where there has been *connivance or actual fraud by the prosecution preventing use of evidence by the accused at his trial*." (Emphasis supplied.)

And in Burns v. Lovett, 1952, 91 U.S. App.D.C. 208, 202 F.2d 335, 339, affirmed 1953, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508, the court said:

> "Habeas corpus has been held to lie in criminal cases * * * where there has been * * * a *deliberate suppression* of favorable evidence * * *." (Emphasis supplied.)

There is a growing tendency in the courts of this circuit to hold that, in criminal matters, the essence of a fair trial calls for a higher duty on the prosecutor in weighing contradictory evidence than has heretofore been the custom, and where necessary in the interests of justice, in making such contradictory evidence available to defense counsel. In U. S. ex rel. Thompson v. Dye,.3 Cir., 1955, 221 F.2d 763, 769, Judge Hastie, in a concurring opinion, says:

> "It can be said that the prosecutor must not act in an essentially un-

'fair' way. But this is an area in which the question of fundamental fairness depends so much upon the facts of the particular case that a precise rule cannot be devised. * * * In brief, it is not every case in which the prosecution must reveal the availability of testimony inconsistent with the government's contentions. But in special circumstances such nondisclosure may * * * amount to fundamental unfairness in the trial of a criminal case."

And in United States v. Rutkin, 3 Cir., 1954, 212 F.2d 641, 644, the court held that "The deliberate suppression by the prosecution of evidence favorable to a defendant may constitute a denial of due process."

With the foregoing as the standard by which to measure petitioner's charges of suppression of evidence, a closer examination of them will be made now.

Among petitioner's several documents and records accompanying his application, is a "supplemental memorandum and supplemental appendix"[2] which he had submitted to the Supreme Court of New Jersey. The appendix contains some 24 items which include various police and probation reports, and records of criminal charges. These items relate either to the instant case or to other police matters in which petitioner was in some way involved. It is not clear whether petitioner intends to assert suppression of all these items. Many of the items in question are inferentially referred to as being evidential of a "pattern" by which the truth was suppressed. The items which petitioner seems to more directly charge as suppressed evidence are the prosecuting witness' description of her assailant, as related to Lt. Hann and Detective Duelks of the Westfield police on January 31, 1953, and the report which Lt. Hann submitted on February 25, 1953, concerning the visit to Belle Mead on February 3, 1953.

The substance of petitioner's allegations relates to the fact that the prosecuting witness' description of her attacker to the Westfield police did not conform to petitioner's actual description; and that Lt. Hann's report stated that the prosecuting witness, Lois Stiles, told Lt. Hann, after the confrontation of Landeros in Belle Mead, that Landeros was not the man who had raped her.

It should be noted that at the trial the prosecution sought to interrogate Lt. Hann concerning the description given to him by Lois Stiles on January 31, 1953 in the following excerpt from the testimony.

* * * "Q. Did you interview Lois Ann Stiles on the 31st of January, 1953, in connection with the assault and rape on the prior night? A. Yes, sir.

"Q. At that time did you obtain from Lois Ann Stiles a description of the person who was alleged to have assaulted and raped her on the previous night?

"Mr. Burrell: If your Honor please, I object to that on the ground this is hearsay.

"The Court: Well, the answer is yes or no. It could only be answered yes or no.

"A. Yes, sir.

"Q. What description was given to you by Lois Ann Stiles of the man who attacked her on the prior night?

"Mr. Burrell: I object to that.

"The Court: Objection sustained, because it would be hearsay. * * *" R. pp. 49a and 50a.

As can be seen, the prosecution's attempt to have Lt. Hann repeat the description given to him by Lois Stiles was halted by petitioner's lawyer. True, the defense attorney was not aware that the answer might perhaps be favorable to

---

2. Respondent likewise furnished this court with a "supplemental memorandum and supplemental appendix" (previously submitted to the New Jersey Supreme Court), which contains some ten items of police reports and related material.

the defense, but the importance of this line of questioning, for the purpose of this petition, is that it reveals that the prosecution in open court was not attempting to conceal what Lois Stiles had told Lt. Hann at the very outset of her contact with the police.

The original description of the accused described him as 5'6", and "light-colored". Petitioner is "light-colored", but is 5'10". At the trial, Lois Stiles described her assailant as being 5'8", still not accurate. But the defendant was identified in his true person to the jurors. He was before them so that they could see what he looked like. Yet they did not view the discrepancy in Lois Stiles' description as sufficiently important to•affect their decision.

Another point emphasized by the petitioner is the fact that Lois Stiles had not described her attacker as having a moustache, whereas he does, in fact, have a prominent one. It is pertinent to note, however, that this is an omission in a description, not altogether improbable under the circumstances, and not having the same significance as a mis-description reversing the facts—as would be describing her attacker as having a moustache, when he did not. The latter situation would be more persuasive of faulty identification. There may be times when errors of omission are as damaging as errors of commission—but this is not one of those times. It is most significant, too, that the Rahway police, after apprehending Landeros, sent out a teletype description wherein the police themselves, certainly more experienced in such matters than the victim of the rape, also omitted mention of the moustache.

Petitioner makes much of the report prepared by Lt. Hann of the Westfield police, relative to the visit to Belle Mead for the confrontation of Landeros. This report as mentioned earlier, has Lois Stiles stating that Landeros was not the man. However, it was written some three weeks after the date of the visit to Belle Mead, and is very different in tone fron a report submitted by an accompanying police officer from Cranford, a Lt. Rosendale, only two days after the Belle Mead visit. The latter report stated that Lois Stiles and a woman who had been the victim of a rape in Cranford, "could not make a positive identification".

I do not pass judgment on which report is the more accurate. However, on this very matter of a difference or discrepancy in reports between the Cranford and Westfield police, petitioner's own Supplemental Memorandum, p. 8, contains the following footnote with regard to ascertaining a date:

"We would assume the Cranford records to be more accurate in this regard because made more contemporaneously with the Belle Mead trip."

If I am to accept this form of reasoning then it would follow that Lt. Rosendale's report is to be considered "more accurate."

In the light of all the circumstances, the accusation that the Hann report was suppressed is unsupported. Further, the fact that Lois Stiles failed to identify Landeros before the police officers at the Belle Mead confrontation, or at the very least, that grave doubts concerning such identification surrounded her testimony at the trial, could not have been lost on the jury. As the Supreme Court of New Jersey noted in State v. Landeros, supra, 20 N.J. at page 79, 118 A.2d at page 526:

"Concededly, her testimony as to the Belle Mead incident was vacillating and uncertain and undoubtedly affected her credibility in so far as her identification of the defendant was concerned."

But, as the court there concluded, it was for the jury to weigh her inconsistencies and determine their effect upon her credibility.

But most important, on the question of whether the jury had before it the inconsistent or contradictory statements made by Lois Stiles upon which petition-

er relies so heavily, the Supreme Court of New Jersey made this very pointed observation:

"The trial court, at the defendant's insistence, specifically charged that in considering the weight to be given to the alleged identification of the defendant by the complaining witness it 'must consider her prior failure to openly identify the same defendant at Belle Mead Depot * * *.' It likewise charged:

"'The jury must weigh and consider all the evidence, including any contradictions and inconsistencies in the evidence, including the question of identification and the weight of such identification, and if the jury, after considering and weighing all the evidence, is not satisfied beyond a reasonable doubt that the complaining witness has identified the defendant as her attacker accurately and truthfully, he should be acquitted'". State v. Landeros, supra, 20 N.J. at page 83, 118 A.2d at page 528.

It is quite apparent from the foregoing, therefore, that the jury entered into its deliberations after being put on notice concerning inconsistencies and contradictions in the testimony of Lois Stiles.

■ Related to this situation is the charge by petitioner that Lois Stiles gave testimony which the prosecution knew to be false. This concerns the fact that at the trial, Lois Stiles stated that during the time she was at Belle Mead, she wasn't sure that petitioner was the man who attacked her, but that on the way home from Belle Mead, she did become sure that it was he, and so informed either Chief Pfirrmann or Lt. Hann, the accompanying Westfield police officers. After a recess which followed soon after this testimony, Lois Stiles voluntarily corrected her testimony by saying that, after she had become convinced of the identity of her attacker, and that it was the petitioner, she related this to someone other than the accompanying police.

Petitioner now claims that the prosecution was under a duty to put witnesses on the stand to corroborate Lois Stiles' identification of petitioner. This demand for corroboration, however, is not clear. If petitioner is demanding corroboration, in general, of her testimony identifying petitioner on the basis that her testimony was insufficient to support the finding of a verdict of guilty, it is beyond the scope of this court's inquiry, for the instant petition would then be in the nature of an appeal from a state court decision. See United States ex rel. Brogan v. Martin, supra, 3 Cir., 238 F.2d 236. If, however, petitioner is directing his demand for corroboration to the Belle Mead identification, it is then incumbent to ask how the prosecution is expected to corroborate an identification which was not, in fact, communicated to them. The prosecution's own witness, Lois Stiles, after correcting herself on earlier testimony, testified that she did not communicate to the police her later belief in petitioner's identity as her attacker. And the police records themselves—which petitioner himself points out—disclose no such communication to them as a result of the Belle Mead visit. In fact, a report of March 11, 1953 made by Lt. Hann and Det. Duelks of the Westfield police, following Lois Stiles' identification of petitioner at Rahway, concludes with the following:

"We asked Lois Stiles why she did not identify Albert Landeros as her attacker when she saw him at Belle Mead, N. J.; she said at that time she was sure it was him but was afraid to say it was him because the lady from Cranford did not say it was him."

The prosecution was under no duty to corroborate this statement of their own witness, nor would it, in effect, have been of any consequence. In fact, any testimony offered as to conversations not made in the presence of the petitioner would have been subject to objection as hearsay, an objection which petitioner raised on a number of occasions at the trial. The charge that Lois Stiles gave testimony which the prosecution knew to be false has not been borne out.

Another element to which petitioner points, as constituting a denial of due process, is the alleged "pattern" by which the police labelled him a rapist. As noted earlier, petitioner's supplemental appendix contained many police reports and records. Petitioner infers, if he does not assert, that these reports and records indicate that the police of Plainfield, Cranford, Westfield and Rahway,[3] (towns in close proximity to each other), created a pattern of labelling him a rapist which could only result in either unduly influencing any victim of a rape when accusing or identifying petitioner, or that the police were out "to get him", or both.

The following reports, taken mainly from petitioner's supplementary appendix, are quoted in order to get a more understandable picture of petitioner's relationship with the police of the several communities.

The Plainfield record reveals that on the night of August 7, 1952, a 21-year-old girl was robbed and assaulted. Her statement to the police is as follows: (p. 10a of petitioner's supplemental appendix).

"I, Miss G. A., being of sane mind make the following statement of my own free will, without duress or threats or promise of reward, knowing at the same time that anything I say can and may be held against me in Criminal procedure.

"I was born in Dunellen, New Jersey on May 25th, 1931 and I have been living in Plainfield, New Jersey for about eight or nine years. I live with my parents at ——— ——— Street, Plainfield, New Jersey.

"Last night about 7:00 p. m. I went shopping with a girl friend of mine in Plainfield and after shopping me and my girl friend went to Grunings on E. 5th Street to have something to eat. After eating we went to Watchung Avenue and E. 3rd Street and I sat in front of the church with my girl friend until the 10:05 bus came along. My girl friend got on the bus and I left to visit another friend of mine on Madison Avenue. I was wearing green shorts, a green and white polo shirt and a blue silk kerchief. I also had a string of pearls around my neck. I was carrying two paper bags. I had a wallet and a bathing suit in one and a pair of panties and miniature roller skates in the other bag. I walked down Watchung Avenue to E. 5th Street and down Fifth Street to Park Avenue. When I got to Park Avenue and W. 8th Street I turned right on Eighth Street and then I walked across the street to the south side. When I got to Arlington Avenue and Eighth Street I noticed a car travelling slowing and the person driving looked toward me, and then he turned right on Arlington Avenue or in the direction of 7th Street. I noticed that this car had a red reflector over the back license plate. I continued to walk down Eighth Street to Madison Avenue. When I got to the corner of Madison Avenue and Eighth Street I noticed that this same car had pulled up and stopped on the wrong side of the road on Madison Avenue to about the first driveway south of Eighth Street. Someone had gotten out of the car on the driver's side and he ran in the driveway and then he called out, 'I'll pick you up tomorrow.' As I walked by this car and looked over toward it I noticed that there was nobody in the car. The car was parked along the curb on the wrong side of the street. Then all of a sudden this person came out of the driveway and grabbed me from the back and said, 'Please do not yell'. He tried to drag me to the car but I wouldn't go..

---

3. There is an allusion by petitioner to a Boundbrook case also. No records or documents are furnished from which conclusions can be drawn in connection therewith.

I tried to fight him off but I couldn't, and seeing that he couldn't get me into the the car he then started to pull and drag me on the ground on to the property. I couldn't shout for help because he had his hand over my mouth, and he said to me, 'I want your money, that's all I want. Where is it.' This person spoke in a sort of a broken Spanish accent. He couldn't pronounce his English words correctly. He asked me to tell him to point at which bag I was carrying had the money [in] it. I pointed to the bag and he grabbed it and at the same time he was holding his hand over my mouth with the other hand. He tore the bag and he put the wallet in his back pocket. Then he threw me on the ground with my face toward the dirt and he took the kerchief off my head. He then said, 'I'm going to tie your mouth so you will not scream. So help me, I'll kill you if you do yell out.' He pulled my shirt up from my back and I felt a sharp instrument on my back. He then put this instrument back in his pocket. Just about that time I poked him in the stomach with my elbow and he released me. I yelled for help as I had seen the lights of a car coming up from Madison Avenue. While I was struggling with this person I remember that he had bushy hair, or rather long hair because it kept falling in front of his face as I was struggling with him. He was rather well built and he was about 5'9" tall. He was wearing sort of a tan shirt and light trousers. When I shouted for help this person left hold of me and ran off through the back yards toward Arlington Avenue and as he was running away from me he said, 'I'll get you.' I then got up and ran toward a house yelling for help as I was running. I ran right in a house through a door which was unlocked and closed the door behind me. I kept hollering for help and then the police came up to the door and asked me what happened. I told the police that I had been robbed, that someone had assaulted me and took my money. The officers took me to police headquarters. A short time later I saw a very light skinned colored man at police headquarters and he looked to me like the same person that had assaulted me on Madison Avenue. I mean by that his build was the same and his clothes were the same as near as I could remember.

"Later on the officers brought a scarf and a set of pearls which they said they found in the yard where I was attacked and I recognized them as mine.

"Signed,
"/s/ ——— ———"

The following, copied from petitioner's Supplemental Appendix, p. 12a, bears no signature or heading, but would appear to be a police report of the same events relating to the aforementioned robbery and assault:

"G. A., age 21, wearing shorts and blouse with kerchief on her head was grabbed hold of by a man while she was walking south on the sidewalk and was pulled and dragged into the yard of The Higgins Funeral Home for about ninety feet.

"The attack took place on the east side of Madison Ave. about 100 feet south of West Eighth St. at approximately 10:30 P.M.

"The man was of good size and build and strong. He kept his face lowered so it could not be seen and spoke with a sort of Spanish accent. He kept his hand over her mouth most of the time and also had her by the throat to stop her from screaming. He took her scarf from her head and attempted to tie it over her mouth.

"He told her not to yell out and said he would take his knife and kill her as he had killed a woman in New York. In the scuffle on the ground behind a large evergreen tree he

pulled a paper bag from her hand and took her black wallet from it and carried it away. It contained a five dollar bill, a quarter and some pictures and two keys.

"As she screamed the man broke away and ran through Higgins yard in front of his garage and out to Arlington Ave. He did not go back to the car he got out of.

"She ran to the Higgin's Funeral Home and knocked at a rear door. The police arrived shortly. Officers Hennessey and Reilley found the car still on Madison Ave. and learned it belonged to Albert Landeros of 12 Berkley Terrace.

"While the men were still searching the vicinity for the occupant of the car Albert Landeros called Headquarters from Abram's Tavern and said his car was stolen a short time before. He was brought to Headquarters by Officers Hennessey and Reilley.

"He denied attacking the girl and said the car had been stolen while he was in Abram's Tavern.

"Off. Hennessey noticed that his shoes were wet about an inch and a half up the sides and that they also had considerable fresh dark mud up them as if he had run through yards or gardens. Also that there was no mud in the car. If he had gotten this mud earlier there would have been some of it on the floor boards when he drove.

"A hooked blade pruning knife was found in the glove compartment of his car. He admitted owning this knife and getting it from Mr. Taylor.

"Mr. Taylor admitted having been with Landeros earlier in the evening and leaving him on Plainfield Ave. about 10:30 P.M.

"Off. Hennessey asked Landeros how much money he had shortly after he was arrested and Landeros replied 'About $13.00'. Right after that he said $17.00. This second reply increased the amount just about the sum taken from Miss A. Upon looking in his wallet Officer Hennessey found a $10.00 bill, a $5.-00 bill, two $1.00 bills, a quarter, two dimes, a nickel and four pennies. A $5.00 bill and a quarter were taken from Miss A.

"Officers Hennessey and Reilley later found Miss A.'s scarf, a set of pearl beads that she had been wearing and a paper bag on the ground near the evergreen tree in the Higgins yard.

"Landeros' father is Mexican and can speak Spanish and Albert is believed to be able to speak it somewhat also.

"Landeros when apprehended was wearing a 'T' shirt that once had been white but was quite soiled and a light bluish pair of trousers and no hat.

"Landeros could have easily gotten the eight blocks from the scene of the attack to Abram's Tavern by the time he made the phone call to Police Headquarters."

Petitioner was arrested that same night and charged with *robbery* and *carrying a concealed weapon,* but the charges were later dropped because of "insufficient evidence".

The Cranford police became interested in Landeros because of an unsolved rape committed in that town on November 1, 1952. On February 2, 1953, shortly after the Westfield rape (instant case), the following report was made by Lt. Rosendale of the Cranford police department to his superior officer, Chief of Police Fischer (p. 19a of petitioner's Supplemental Appendix):

"Subject: Continued Investigation of person who committed crime against Miss E. M., November 1, 1952, at 7:45 P.M.

"Sir:

"Chief Pfirrmann of Westfield Police informed me that Plainfield Police had some valuable informa-

tion in reference to a rape case which occurred in Westfield, N. J., Saturday night, Jan. 31, 1953.

"The Cranford rape and the Westfield rape were both practically identical in Modus Operandi.

"It was agreed upon that Chief Pfirrmann, Detective J. Duelks of Westfield and the undersigned go to Plainfield, N. J., to weigh the information they had.

"Captain Denny of Plainfield Police informed us that Albert Herman Landeros, colored, of that city was probably the man we were looking for as to have committed the crime in Cranford and Westfield. He answers the description and has a mother who is a Negro and a father who is Spanish.

"He was arrested for an attempted rape in Plainfield but was not convicted due to lack of evidence, however Plainfield Police are certain of his guilt. The subject is very shrewd and will parry his words with Police and admit nothing.

"It was suggested we go to Scotch Plains to contact a Bar Tender of a saloon there, where Landeros spends much time.

"Chief Erholm was contacted and when attempt was made to contact the Bar Tender, it was found that he was out of town due to it being his day off.

"It was ascertained that Landeros was employed at Belle Mead U. S. Army Ordnance Depot as a welder. It was agreed upon that we go to Belle Mead to see if arrangements could be made to have the women view Landeros and hear him talk for a possible identification as to his being the guilty person who had committed the crimes in Cranford and Westfield, N. J.

"Lieutenant Ancontue of the U. S. Army who is the Provost Marshal stated that if Landeros reported for work Wednesday, Feb. 4, 1953, he would arrange to have him called into the office and converse with him, in the presence of the women.

"Miss E. M. was contacted for the arrangements to conform with the above.

"Westfield Police will make arrangements with their party and if all is satisfactory, undersigned and the Westfield Police will go to Belle Mead.

"Respectfully submitted,
"/s/ Geo. L. Rosendale
"George L. Rosendale
"Lieut. of Police"

Westfield police became interested in Landeros, after the rape in instant case, because of his earlier involvement with the law in Plainfield, an interest which was intensified following his subsequent involvement in Rahway. In both situations, the Westfield police knew that women had been molested. On March 11, 1953 the following report was submitted jointly by Lt. Hann and Detective Duelks to Chief Pfirrmann of the Westfield police (pp. 7a and 8a from petitioner's Supplementary Appendix):

"Sir:

"I hereby report the rape of Lois Stiles age 19, white, of ——— ——— Avenue, Westfield, N. J., on January 30th 1953 at about 10:15 P.M. in a vacant lot on East Broad Street, Westfield, N. J. about 100 feet from entrance to the Mindowaskin Park.

"Lois Stiles said that she was walking east on Broad Street and had passed the entrance to Mindowaskin Park, she saw a man walking west on East Broad Street, this man walked from one side of the walk to the other and appeared as if he had been drinking, as he neared her, she saw he was colored, Lois said she became frightened and started to walk near the curb so as not to pass close to him, when this man came abreast of Lois, he ran over and placed both hands around her neck and mouth, he said 'Don't yell or say anything, all I want is your

money' and he kept asking how much money she had. All this time he kept pulling her into the empty lot, when he had dragged her about 100 feet from the sidewalk he told her to remove her coat, after Lois had removed her coat he told her to wrap it around her head, he then knocked her to the ground, committed indecent acts on her and raped her. He told her if she hollered or took the coat from her head he would kill her as he had killed one woman and one more would not make any difference, he also said the army was looking for him and after tonight she would be looking for him. After he had raped her he told her to lay still for two minutes as he had to meet a friend in Rahway.

"Lois said that she lay still for a short time and then got up and ran across the street to Rev. Blatz's residence 414 E. Broad Street and told him what had happened. Lois called her parents and Police also were called. Lois's parents came and took her to Dr. M. Tyndall's office for treatment.

"Lieut. Vassil, Officers E. Greer and Dail were sent on call to investigate.

"Chief Pfirrmann, Lieut. Hann and Det. Duelks were also called to investigate.

"A teletype alarm #1654 was sent out for this rapist.

"On January 31st 1953 a statement was taken from Lois Stiles by Lieut. Hann and Det. Duelks at her home in which she described her attacker as being about 5' 9", stocky build, large hands and lips and was wearing a light colored 'Be Bop' cap, dark tight fitting jacket ending at waist line, light trousers and a large doublebanded gold ring on one of his fingers. He kept addressing her as seniorita and spoke with a Spanish accent.

"Lois Stiles was shown a number of pictures of sex offenders who have been arrested in this Town and surrounding Towns. She was shown a picture of Albert Landeros age 26 of 12 Berkley Terr. Plainfield who had been arrested on suspicion of rape in Plainfield, N. J. and said that this man looked like the one that had attacked her.

"Lois Stiles and a lady from Cranford who had been raped by a man answering the same description in November 1952, were taken to Belle Meade, N. J. where Albert Landeros is employed as a welder for the Army Depot. Albert Landeros was brought to the Security Office and was questioned by the Security Officer, Lois Stiles and the lady from Cranford sat in the office listening to his voice and observing him. Lois said that she was not sure about him and did not want to say that this was positively the person that attacked her. The lady from Cranford said that she felt the same way.

"On March 3rd 1953 Albert Landeros was arrested by the Rahway P. D. for attempting to rape a white girl in there [sic] City.

"Lois Stiles was taken to Rahway to look at Albert Landeros and she said that positively that this was the man that raped her on January 30th 1953, she said that he is even wearing the same jacket that he wore on the night of the attack and he is wearing that double banded gold ring.

"Lois Stiles signed a complaint against Albert Landeros charging him with rape, the warrant has been forwarded to Union County Jail where Albert Landeros is being held without bail for the action of the Grand-Jury.

"We asked Lois Stiles why she did not identify Albert Landeros as her attacker when she saw him at Belle Meade, N. J., she said at that time she was sure it was him but was afraid to say it was him because

the lady from Cranford did not say it was him.

> "Respectfully submitted
> "/s/ Lieut A. Hann
> "Lieut Hann
> "/s/ Det. J. Duelks
> "Det Duelks"

The Rahway record reveals that on the night of March 8, 1953, a 17-year-old girl was assaulted. The following two separate reports, in which the offense was entitled "attempted rape," were submitted by members of the Rahway police and are copies of *respondent's* Supplemental Appendix, pp. 10a and 12a:

"Chief C. W. Dunphy

"Sir,

"At approximately 9:20 P.M. this date Ptlm. Wagner & myself were detailed by Sgt. Crahan to 195 W. Main St. to investigate a woman who had been attacked. When we arrived at the intersection of Main & Elizabeth Ave. an unidentified man reported he saw the suspect running down Elizabeth Ave. toward W. Grand Ave. After searching the neighborhood for approximately 45 minutes we finally spotted him running on Monroe St. toward Essex St. When he realized we were chasing him he took to the backyards. Wagner and I split up and finally cornered him against a high cyclone fence at the rear of 118 Monroe St. Wagner fired several shots at him but did not hit him. When we got him in the light we found blood on his clothing and his fly was open. Miss F. identified him as the man who had attacked her. He was brought into headquarters and turned over to Detective Kinch. He was identified as Albert Landeros, age 26, of 12 Berkley Terrace, Plainfield. His car was later found in front of the Recreation Headquarters on Main St. and brought into headquarters by Ptlm. Wagner.

> "Respectfully submitted,
> "Patrolman Fred B. Brauer
> "Shield #. 26"

"Chief C. W. Dunphy

"Sir: At 9:21 P.M. this date Officer Shepley and I were detailed to 195 W. Main St. Upon our arrival we were met by the above young lady. She stated that she was walking west on West Main Street and she noticed a man behind her at Elizabeth and Main Street. She continued walking west toward Irving Street. At the rear of the Rahway Theatre this man ran and caught up to her. He clamped his hand over her mouth and nose with such force that he knocked her to the ground and made her nose bleed. She screamed and a gang of young men from 195 W. Main Street came to her assistance. These men chased the suspect to the Wheatena Park and lost him. Sergt. Crahan detailed detective Kinch, officers Wagner and Brauer to assist us.

"Officer Wagner and Brauer picked up Albert Landeros, age 26, 12 Berkley Terrace, Plainfield, N. J. at Essex and Monroe St. When Miss F. saw him she stated that he was the man that attacked her. We brought him to headquarters and turned him over to detective Kinch.

> "Respectfully submitted
> "Charles Brandt Pat #12

"P.S. There was blood on Landeros clothes and his fly was wide open when we picked him up."

Landeros was arrested and charged with assault and battery—not with attempted rape. This charge was nolle prossed on February 28, 1955 by the Prosecutor of Union County (which embraces Westfield, Cranford, Plainfield, and Rahway among others), subsequent to Landeros' sentence on January 21, 1955 to a term of 10 to 12 years upon conviction for the rape of Lois Stiles in Westfield, which sentence he is now serving.

In the main the foregoing records are those brought forward by petitioner. But they refute any suggestion or charge that the police were out "to get him".

The facts not only warranted, but virtually demanded police interest in Landeros in the several Union County municipalities. Petitioner's arrest by the Plainfield police on August 7, 1952 and by the Rahway police on March 8, 1953 were, as the foregoing record shows, anything but specious or "conspiratorial". In each situation, too, Landeros was arrested under circumstances and conditions which could reasonably lead the police to suspect him of being a sex offender.

Whether Landeros could be convicted of the assaults for which he was arrested in Plainfield and Rahway is not the test of an illegal pattern of operation by the police prejudicial to petitioner's constitutional rights, nor is it pertinent that the charges were dropped. What is important is that there appeared to be adequate reason for the police of the several communities to view Landeros as a *suspect* in rape or attempted rape cases. The fact that the police of neighboring communuities exchanged, supplied, or pooled information and "leads" in such matters is, indeed, consonant with proper police practice and not a sign of a subtle and nefarious plot. Indeed, were the police to do less, would they not be derelict in their sworn duty to protect society?

We may well ask whether due process requires the police to so isolate themselves within their municipal borders as to avoid mutual cooperation in common problems. The perpetrators of crime are no respectors of municipal and state boundary lines. Due process requires neither stupidity nor inaction upon the part of police officials—although it does demand from them complete regard for constitutional guarantees.

Petitioner urges that Lois Stiles identified him in Rahway as the one who had raped her, only because the police indicated to her that he was a rapist. Petitioner offers as evidence of this charge, a statement given to the Westfield police by Lois Stiles on March 9, 1953 after identifying petitioner at the Rahway Police Headquarters. It reads as follows (p. 6a, petitioner's Supplemental Appendix):

"I, Lois Stiles live with my mother and father at the above address and am employed at the General Electric Co., Highway #22, Springfield, N. J.

"At about 1:30 p.m., March 9, 1953, Chief Pfirrmann and Detective Duelks of the Westfield Police Department came to the place where I am employed and informed me that the Rahway New Jersey Police had picked up a colored man who attempted to attack a white girl in Rahway last night and they asked me if I would be willing to go to Rahway to see if I could identify this man as the one who had attacked me in Westfield on January 30, 1953. I told them that I most certainly would be willing to accompany them to Rahway for possible identification purposes. When we arrived at Rahway Police Headquarters Chief Pfirrmann spoke to two detectives that were there and explained to them why I was there and the detectives told me to stand in the hall and they would bring the prisoner out of the cell block and walk him in to the detective squad room. I waited in the hallway with a detective and another man that I do not know and they brought the prisoner out and walked him down the hall to the squad room. He was wearing a navy-blue foul weather jacket and it was the same jacket that he was wearing the night he attacked me and I am positive that this is the same man that attacked and raped me in Westfield on January 30, 1953.

"Q. Is there any other marking or identification about this man that helped you to identify him? A. Yes, he wore a double-banded gold ring that I remember very distinctly the night of the attack. Also, his facial features and his moustache.

"Q. Are you positive that this is the man that attacked you? A.

I am absolutely positive that this is the man that attacked me.

"I have read the above statement and it is voluntarily given of my own free will and accord at Police Headquarters, Westfield, N. J., on March 9, 1953, and that it is true.

"/s/ Lois Ann Stiles

"Sworn to and subscribed before me this 9th Day of March, 1953

"Witness:

"/s/ Albert Hann

"/s/ John Duelks

"/s/ Alfred Vardalis, Jr.

"Notary Public of N. J.

"My commission expires Jan. 23, 1958."

Petitioner assails this identification by imputing to the police an invidious attempt at undue suasion in referring to their suspect as a "colored man who attempted to attack a white girl in Rahway last night." It is argued that this was said to influence Lois Stiles to identify the same individual as her attacker. But the statement does not support the charge. The police knew of petitioner's involvement in the attack on a woman in Rahway. That they told Lois Stiles of this prior to her visit with them to Rahway for the purpose of viewing the petitioner was not, under the circumstances, an abnormal observation and cannot be construed as either prejudicial or evidence of the exertion of undue influence over Lois Stiles in an attempt to procure her wrongful identification of petitioner.

As part of the "pattern" of "getting him" which petitioner attributes to the police, is his charge that E. M., the victim of the Cranford rape, was asked by the police to file a complaint against petitioner as her attacker, even without viewing him in Rahway. This charge is based on a report submitted on March 9, 1953 by Lt. Rosendale to his superior officer, the Chief of Police of Cranford. In it he says the following (from p. 22a of petitioner's Supplemental Appendix):

"Miss M. was advised to appear before the court clerk to sign a complaint against the named defendant. She promised to do this at her earliest convenience."

This statement is, of course, open to different interpretations. Petitioner has chosen to interpret it as a manifestation of sinister police action. Miss E. M., in point of fact, viewed petitioner in a police line-up of eight men in the Union County Jail in Elizabeth, N. J. on March 21, 1953 and identified petitioner as her attacker. No record of her signing a complaint against petitioner appears in the record submitted to me.

■ Viewed in the totality of its background, Lt. Rosendale's statement appears to be nothing more than the work of a police officer zealously intent on pursuing a case to what he had every reason to believe would be a final and just conclusion. I cannot read into his statement any attempt at subverting justice.

Petitioner objects to the Westfield police referring to him as having "been arrested on suspicion of rape in Plainfield" and "arrested by the Rahway P. D. for attempting to rape a white girl" in that city. Admittedly, this was not factually correct; but neither was it an unreasonable conclusion under the circumstances. The police, in effect, were relating their appraisal of each situation in what they considered to be realistic terms. To invert this approach or estimate by seeing it as a scheme "to get" Landeros is wholly unwarranted.

The same Westfield police report is viewed by petitioner as contradicting Lois Stiles' trial testimony that the Westfield police had not described Landeros to her before taking her to Belle Mead. The basis for this allegation is that the report refers to the police showing her pictures (including Landeros') of possible sex offenders, for identification. Without belaboring the point—whether the showing of photographs for identification is equivalent to a "description"—I shall assume that Lois Stiles told an untruth concerning this matter. Similarly, evidence seems to be available to prove that petitioner has no

accent, as a contradiction to the description of Lois Stiles' attacker as having a Spanish accent.

But should not this evidence under discussion properly be considered as new or additional evidence—rather than suppressed evidence. As such, it has already been examined by the New Jersey Supreme Court, which concluded that the non-introduction of such evidence at the trial had not been prejudicial to petitioner. The court there said, in State v. Landeros, 1955, 20 N.J. 76, 84, 118 A.2d 524, 529:

> "Counsel for the defense and the prosecutor of the pleas, evincing firm faith in their respective beliefs, in a rather unusual procedure consented to our going outside of the record in an effort to find further light by examining documentary material which was subsequently offered as having some bearing upon certain disputed questions of fact relating to the issues presented to the jury. This material, although helpful, *had no persuasive significance in our ultimate determination.*" (Emphasis supplied.)

■ It was observed earlier that a United States District Court, when petitioned for a writ of habeas corpus, cannot undertake the review of disputed factual questions already tried in the state courts. As the Supreme Court of California stated in Ex parte Horowitz, 1949, 33 Cal.2d 534, 203 P.2d 513, 521:

> "Petitioner undoubtedly has established that at the trial there were disputed issues of fact and grave conflicts in the evidence. But the existence of such issues and conflicts at the trial, *or the discovery of new evidence pertinent to them,* presents no ground for intervention by us on habeas corpus." (Emphasis supplied.)

The sole matter at hand, therefore, is whether there has been a denial of due process prejudicial to petitioner, for which a writ of habeas corpus should be granted.

Petitioner, after having had the opportunity of examining all the material now available on both sides of the case is, in effect, now spot-lighting the prosecution's real or apparent weak points, while emphasizing his own strength. Petitioner is in effect arguing that on a second go-round, he would do much better. Perhaps so. But he has not sustained his contention that his constitutional rights were denied, though he included both a probation and psychiatric report made after the trial.

Both reports are totally extraneous to the constitutional questions raised in this case. Nor do they contain any material which in themselves point to a miscarriage of justice. Petitioner draws encouragement from the "psychiatric evaluation" of an examination made on November 15, 1954 which concludes as follows (p. 34a of petitioner's Supplemental Appendix):

> "The interview fails to reveal any signs of psychotic or highly psychopathic behavior and in this respect confirms the previous findings of Dr. Boutelle who examined the man approximately one year ago. The psychiatric findings at this time are insufficient to point to a personality with compulsive and pathological sex trends, notwithstanding the fact that the crimes themselves would point to such a type of personality. In view of this, the examiners feel that he would be treated as a correctional case and committed to a penal institution."

Obviously, this report, too, failed to influence the New Jersey Supreme Court, as noted earlier. And for the purposes of this petition, it is completely unacceptable.

The main thrust of petitioner's assertions of denial of his constitutional rights is directed to the proposition that his conviction was based on a combination of testimony known by the prosecution to be false and suppressed evidence, and failure by the New Jersey Supreme Court to order a new trial because of such suppression.

Petitioner has cited Pyle v. Kansas, 1942, 317 U.S. 213, 63 S.Ct. 177, 87 L. Ed. 214; Mooney v. Holahan, 1935, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791; Chessman v. Teets, 1955, 350 U.S. 3, 76 S.Ct. 34, 100 L.Ed. 4; and United States ex rel. Montgomery v. Ragen, D.C.N.D. Ill., E.D.1949, 86 F.Supp. 382, as supporting his position. Pyle, Mooney, and Chessman, supra, each charged denial of constitutional rights because of either fraud, suppression of evidence, or perjured testimony. When such charges are proved on their merits, they, of course, constitute a denial of constitutional rights. However, Pyle, Mooney, and Chessman stand for the common proposition that when allegations are made of a denial of due process in violation of the Federal Constitution, such allegations must be met on the merits and not be summarily dismissed.

The Ragen case, supra, which petitioner describes as "strikingly similar in many respects" is similar only in the fact that the defendant in each case was a colored man accused of raping a white woman. In Ragen, the prosecution had in its files incontestible medical evidence showing that the victim of the alleged rape had in fact not been raped, and that, indeed, she was still a virgin. Yet, it proceeded to prosecute without making this evidence available to the defense. No further comparison is necessary to instant case.

There were discrepancies in records, statements, and testimony in the instant case, but they were no more than the inaccuracies that often creep into the recollection of witnesses. They do not rise to the level that the petitioner charges, namely, that the prosecution knowingly interjected false testimony in the case against him.

I am convinced that the so-called "suppressed" evidence was not, in fact, suppressed or made deliberately unavailable in the sense suggested by petitioner. Indeed, a study of the record of this case points to no reluctance by the prosecution to bring the disputed evidence into open testimony in court, and eventually,

before the Supreme Court of New Jersey. Conversely, nowhere in the record is there any indication that petitioner sought to examine police reports pertaining to himself, nor request to see reports or statements made by witnesses called by the prosecution.

Viewing all the matters relevant to the case at bar, I am constrained to conclude that petitioner was not denied any of his constitutional rights.

Hence, It Is on this 29th day of June, 1957, Ordered that the order to show cause should be discharged and that the application of Albert Herman Landeros for a writ of habeas corpus be and the same is hereby denied.