(No. 20224.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES HUDSON, Plaintiff in Error.

*Opinion filed October 25, 1930.*

BRYAN H. TIVNEN, and EDWIN F. MEISTER, (THOMAS R. FIGENBAUM, and CARUS S. ICENOGLE, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT F. COTTON, State's Attorney, and S. S. DUHAMEL, (CHARLES C. SCOTT, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

James Hudson and Frank Switzer were indicted jointly at the October term, 1929, of the circuit court of Douglas county for the crime of arson of a dwelling house on September 30, 1929, in the city of Arcola, Douglas county. Hudson was granted a separate trial before a jury, and his co-defendant, Switzer, was the principal witness who testified against him. The jury returned a verdict on January 11, 1930, finding Hudson guilty as charged in the indictment and his age to be sixty-one years. Motions for a new trial and in arrest of judgment were overruled by the court and judgment was entered sentencing Hudson to the Southern Illinois Penitentiary. He has brought the case here by writ of error for a review of the record.

The case presents some very peculiar features. Hudson's guilt depends almost entirely and solely upon the testimony of Switzer. Switzer was shown by the testimony to be a moron of low mentality and almost entirely blind. He had for several years lived in Lee county, Illinois, and the testimony of several witnesses who knew him there for twenty-five years or less time was that he was of low mentality, had an affliction of the eyes and the bladder, and could not be depended upon to do a job of work; that he would forget what he was told to do and would not do it. He imagined things were true which were not true. His father and mother were both mentally defective. At the time of the trial he was about forty-two years old. He had a wife and six children. The testimony of those who knew him best in Lee county was that they did not think he had the mentality to understand the nature of an oath. He had been granted a blind pension by Lee county, but he afterwards engaged in chicken stealing at night and his pension was revoked. The lawyer who defended him for stealing chickens did it as a matter of charity, without fees. He testified he would not put Switzer on the witness stand because he could not be trusted; that he pleaded guilty and

justified himself on the ground that he took the chickens to make a living for his family, and he did not appear to have any sense of guilt; that he would follow suggestions made by others. It was the witness' opinion that Switzer did not have mental capacity to distinguish between right and wrong; that he acted like a child; that he was always dirty; that he had never been able to earn a living and could not judge values or right from wrong. There were several Lee county witnesses who testified to Switzer's mental and moral condition. One of them was a practicing physician who had attended the entire Switzer family and had known Switzer for about eight years and had treated him professionally. Among other things he stated that Switzer's mind was that of a nine or ten-year-old child.

The competency of Switzer as a witness was objected to. During the progress of the trial, by agreement of counsel, three doctors were selected to examine Switzer as to his condition. One of the doctors was selected by the court, one by the defendant and one by the State. The doctor selected by the court testified, after an examination, that Switzer had not the mental capacity to make a choice as to right and wrong and adhere to it; that he could not reach a logical conclusion; that witness would grade him in mentality as a child about nine years old; that he would justify himself in doing wrong. The doctor selected by the defendant testified Switzer classified as a child nine or ten years old; that he was easily switched from one subject to another and jumped at any suggestions; that he was easily led and his constancy is not permanent; that while witness thought he could make a choice between right and wrong he could not adhere to his choice; that while he was forty-two years old he had the mind of a nine-year-old child. The doctor selected by the State testified he examined Switzer and thought his mental ability was not beyond the third grade; that he had the mental ability to make a complete observation and a recollection sufficient

to communicate his observation, and that he had the mental ability to make a choice between right and wrong and adhere to it.

There was much testimony relative to the intellect of Switzer. It may be summed up, after what we have previously stated, as showing very conclusively that he was a rather irresponsible person, mentally and morally. As is frequently the case with mental defectives, Switzer had a rather keen sense of certain things. He testified as to his understanding of an oath, that "an oath is sworn with the Lord Jesus Christ as your witness." He testified that was a sufficient answer; that he had never thought of it before, but had been told by those in jail that he would be sworn before the Lord Jesus Christ to swear to the truth. It seems apparent that he had a very indefinite and vague idea of the obligation of an oath, but we think the objection to his competency as a witness was properly overruled. It was, of course, proper for the jury to consider in determining the weight to be given to his testimony.

There was no other testimony corroborating Switzer to the effect that Hudson had anything to do with the fire, except it is claimed by the State that the fire was of incendiary origin, that the house was saturated with coal oil before it was set afire, and that the meetings and conversations between Switzer and Hudson after Switzer came to Arcola, and before the fire, were also corroborative. Switzer had gone from Lee county to the State of Missouri, and while he was in Missouri he was supported by charity and the public authorities. He said, while there, that he thought he might be able to get employment in the broom-corn region of Arcola if he were back there, so the Missouri authorities hired a man and his wife and a truck to deliver him to Arcola. Switzer had the driver of the truck, when he arrived in Arcola about September 16, 1929, drive around town to look for a vacant house. The house he afterwards burned was found to be vacant. He had some skeleton keys and

went into that vacant house. He unloaded his few possessions and placed them in the house. He did not know whose house it was but afterwards heard it was Hudson's house. Switzer was partially blind, but was able to go most anywhere around the community in the daytime. He went to see Hudson about a week later and told him he was in one of Hudson's houses. Hudson told him it was not his house but that he had a mortgage on it. Hudson had previously traded this house in Arcola to parties by the name of Anderson, who resided in Chicago, for 71½ acres of farm land and took a mortgage back on the Arcola property for $800, evidenced by a note due January 5, 1930. The value of the Arcola property before the house was burned was $1500. Why Hudson should want the house burned is not easy to comprehend. In all probability he could have disposed of the note and mortgage so as to get his money without making a discount of $200, which is the price Switzer testified Hudson agreed to pay for burning the house. Switzer first testified that Hudson said the "people" (evidently referring to the owners of the house) said they would give $200 to have it burned. He later said Hudson promised he would give him $200 to burn the house. Hudson, and his wife prior to her death, owned eight houses in Arcola and some farm lands, so his necessities could not have been very pressing at the time. Mrs. Hudson died about a week before Switzer came to Arcola, and Hudson, who was afflicted with heart disease and unable to do much work, went to live with one of his married daughters in Arcola. The title to the Hudson properties seems to have been in Mrs. Hudson, and at the time the house was burned Hudson had not yet taken out letters of administration on his wife's estate. The record does not warrant the conclusion that there existed any need for burning the house to collect the amount of the mortgage. Two or three days before the fire Switzer had purchased kerosene and before the fire poured it over the house on the inside and upon the

floors. He testified he got the money from Hudson to buy the oil, which Hudson denied. Switzer said he had $62 when he started from Missouri to Illinois on the truck but claims he lost it, although he made no complaint on the way to the truck driver or his wife. Hudson proved on the trial that the general reputation of Switzer for truth and veracity was bad, several witnesses testifying they would not believe him under oath.

The verdict of guilty rests substantially upon the uncorroborated testimony of Switzer, who was also indicted for the offense. He testified that he had been promised parole if he would testify as he did, and there is no denial of it. While there are other errors in the case, we prefer to base our judgment of reversal on the ground that the ' evidence was not sufficient to establish guilt beyond a reasonable doubt. The authorities on this question are too numerous and too familiar to require citation. While this court will not substitute its judgment for the verdict of the jury where the evidence is conflicting, justice requires the reversal of a judgment of conviction where the evidence is insufficient. Where the credibility of a witness is impeached to the extent shown by this record, a conviction based upon the testimony of such witness, who is also an accomplice and who was the chief witness against defendant, should be reversed.' *People* v. *Ravenscroft,* 325 Ill. 225; *People* v. *O'Hara,* 332 id. 436; *People* v. *Pattin,* 290 id. 542; *People* v. *Harvey,* 321 id. 361.

We do not think it incumbent upon us to further extend this opinion, for in our judgment, if there were no other error than the one to which we have referred and upon which we base this judgment, that would be sufficient to reverse the case. The other errors will probably not occur on another trial of the case.

The judgment of the circuit court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*