THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. WILLIAM BUTLER, DEFENDANT-APPELLANT.

Argued January 25, 1960—Decided April 4, 1960.

168

Mr. *Stephen V. R. Strong* argued the cause for the appellant (*Mr. Joseph F. Deegan, Jr.,* attorney; *Mr. Sam Weiss,* on the brief).

Mr. *William D. Danberry,* Assistant Prosecutor, argued the cause for the respondent (*Mr. Warren W. Wilentz,* Middlesex County Prosecutor, attorney).

The opinion of the court was delivered by

JACOBS, J. ▮ The defendant William Butler was convicted of murder in the first degree and was sentenced to

death. He appeals to this court as of right under *R. R.* 1:2-1(c).

In July 1956 the Koppers Coke Company's office building in Port Reading, Middlesex County, was broken into, its safe was removed and opened, its office drawers and lockers were rifled, and its relief engineer, James Quackenbush, was brutally beaten to death. In January 1957, separate indictments were returned, charging that William Butler, Eugene Williams and his brother Bland Williams, James Winbush and John Coleman had willfully, feloniously and with malice aforethought, killed and murdered James Quackenbush, contrary to the provisions of *N. J. S.* 2A:113-1 and *N. J. S.* 2A:113-2. Winbush was never brought to trial; he was committed as insane and is confined at the State Hospital for the insane, at Trenton. Butler and the Williams brothers were brought to trial in March 1957 and Coleman (who is confined at Bordentown Reformatory on his plea of *non vult*) testified against them as a witness for the State. The trial resulted in a jury verdict of guilty of murder in the first degree and sentence of death. On appeal, this court reversed because of error by the trial judge and remanded the matter for new trial. See *State v. Butler,* 27 *N. J.* 560 (1958). Thereafter, Butler and the Williams brothers were brought to trial, but during this second trial the Williams brothers changed their pleas of not guilty to pleas of *non vult* which were accepted and were followed by the imposition of sentences of imprisonment upon them. A mistrial was declared as to Butler and he was later retried; the third trial was a lengthy one and at its conclusion the jury found Butler guilty of murder in the first degree and he was sentenced to death. His appeal rests on alleged legal errors which, he contends, now call for the reversal of the judgment of conviction entered against him.

The testimony at the third trial bearing on the State's murder charge against Butler followed the same general lines as that which was introduced during the first trial and which was set forth in great detail in the opinion by

Justice Francis. See 27 *N. J.*, at *pages* 568–588. Coleman again testified, in effect, that during the early morning hours of July 20, 1956 he was coerced into accompanying Butler, Winbush and the Williams brothers in their criminal venture; that he and the others rode in a car driven by Bland Williams to a loading ramp at the Koppers Coke Company's premises; that they then all got out of the car, he and Winbush remaining at the car while Butler and the Williams brothers walked to the building; that Butler clipped the screen at the third window, raised the window (with the assistance of the Williams brothers) and entered the building through the window (followed by the Williams brothers); that he heard desk drawers slamming and papers rattling and heard Butler say "over here, over here is the safe"; that he also heard Butler say "You have to roll the safe. You have to roll it on a one, two, three, count" and then after hearing noise and a dog barking he heard "the night watchman" (he called him Mr. Crackenbush) cry out "Who's that? Who is that?"; that he then heard Butler tell the Williams brothers to "go out the back door" and saw the Williams brothers run into "Mr. Crackenbush" and start to punch him; that Butler then moved in on "Mr. Crackenbush" and "hit him on his left side with a club"; that he heard "Mr. Crackenbush" say "Stop, stop. You're hurting me" and he heard Butler reply "I mean to hurt you. You might recognize me. I mean to hurt you. I'm going to do you in"; that Butler continued to hit him until "he fell from all them blows"; and that "after Mr. Crackenbush was laying on the ground" Butler and the others went through his pockets.

Butler testified on his own behalf and denied Coleman's testimony or that he had any part in the robbery and killing and the Williams brothers, testifying on Butler's behalf, also denied Coleman's testimony or that they had any part in the robbery and killing. The State relied on the credibility of the crucial portion of Coleman's testimony relating to the killing and various witnesses were introduced by it to

furnish corroboration and by the defendant to furnish refutation. Victor Beatty testified that in August 1956, while he was confined to the Middlesex County Jail, he had a conversation with Butler during which Butler told him that "he was mixed up in some night-watchman murder," that "they got in through a window and got ten crummy dollars, or something to that effect" and that they "took care" of the watchman. Butler denied Beatty's testimony or that he had ever spoken to him. Detectives Houser and Panconi of the Woodbridge police force testified that on July 30, 1956 Butler and Coleman were housed in adjoining cells and that they overheard Coleman say to Butler "Why don't you tell the cops what you did? They are going to find out anyway" and that in response Butler told Coleman to keep his "mouth shut and don't tell them nothing, don't say anything to anybody."

Several witnesses were called by the State for the purpose of presenting evidence linking Butler with one of two electric razors which were taken from the premises of the Koppers Coke Company. Mrs. Marie Jaeger testified on direct examination that her husband Martin Jaeger had worked at Koppers in 1956 and until his death in 1957; that she had given him a yellow or cream colored electric Sunbeam razor for Christmas; and that her husband had kept it "in his office desk at the plant." On cross-examination she stated that she had never seen the razor at the plant and that her husband had taken it from his home "saying he was taking it to the office for use at the office." Mr. Romanetz testified that he had shared an office at Koppers with his late superior Martin Jaeger; that Mr. Jaeger had two electric razors which he always kept in his desk drawer and that to the best of his knowledge "he shaved with them every day"; and that the razors were missing on the morning of July 20, 1956 and have never been located. Mr. Granville testified that during the night of July 19-20, 1956 Butler came to his home and asked him to hold a package which, as he later discovered, con-

tained an electric razor. Confirmatory testimony was given by Mrs. Raspus who lived in the same house as did Granville and by Mrs. White, a daughter of Mrs. Raspus. Butler denied knowledge of the electric razor or that he had gone to Granville's home as testified by Granville. The State introduced expert testimony to indicate that the safe at Koppers had been subjected to an explosive, as Coleman had testified, and expert testimony indicating that soil specimens taken from the car which, according to Coleman's testimony, had been used by Butler in connection with the robbery, were similar in their characteristics to soil specimens taken from the area in which the safe was found. On the other hand, the defense introduced expert testimony to indicate that the safe had not been subjected to any explosive and that there was no similarity between the sweepings from the car and those taken from the area around the safe. See 27 *N. J.*, at *pages* 581, 583. Further outlining of the conflicts in the testimony would serve no purpose here; there was sufficient testimony which, if believed by the jury, established that Butler had committed murder in the first degree as charged by the State. Two independent juries have unanimously expressed their belief in the testimony and have found the defendant guilty of murder in the first degree and we now properly address ourselves to the various legal points raised by the defendant in the order in which they have been presented in his brief on appeal.

In Point I of his brief the defendant contends that "the court below prejudicially erred in admitting incompetent, irrelevant and immaterial evidence for the State purporting to corroborate the testimony of the accomplice Coleman, it being uncertain, upon the record at bar, whether the verdict of guilty was based upon Coleman's testimony alone or its purported corroboration by other evidence, and the purported corroborative evidence being legally meager." The defendant acknowledges that a conviction may be had solely upon the testimony of an accomplice and cites *State v. Spruill,*

16 *N. J.* 73, 78 (1954), where this court pointed out that it is "settled law in New Jersey that a jury may convict a prisoner upon the testimony of an accomplice alone, if, in their judgment, it is entirely credible and worthy of belief." In the instant matter the trial court, in referring during the course of its charge to the testimony of Coleman, stated that "the degree of credibility to be given to the evidence of a participant or an accomplice is a matter exclusively within the province of the jury" and that the "law dictates that such testimony shall be viewed with caution and carefully scrutinized." Towards the close of its charge it expressly charged several requests which the defendant had submitted including the following:

"12. In considering the evidence of the witness Coleman, an alleged accomplice-witness, I caution you that you are to scrutinize his testimony with great care; to keep in mind the taint of criminality admitted by him and his connection with the crime charged against the accused, and after such scrutiny to weigh his evidence carefully in that light; to consider the extent to which his testimony has been corroborated by witnesses, and you are not to find the defendant guilty of the crime charged against him upon his testimony unless you find it to be entirely credible and worthy of belief and sufficient alone or as corroborated with other evidence to convince you of the guilt of the defendant beyond a reasonable doubt.

13. The corroboration of the testimony of the alleged accomplice-witness for which you as the jurors should look must be upon matters material to the guilt of the accused and his connection, if any, with the crime and not only to the mere facts that a crime had been committed."

The defendant now contends that the foregoing instructions modified the holding in *State v. Spruill, supra* and "required the jury, if it did not find Coleman's testimony entirely credible and worthy of belief, to look for corroboration, not merely as to whether the crime charged had been committed, but further, as to the defendant's connection, if any, with the crime." We find nothing of merit in this contention. Instruction No. 12 was designed to caution the members of the jury to scrutinize Coleman's testimony with great care and not to find Butler guilty on

Coleman's testimony unless (1) they found it entirely credible and worthy of belief, and (2) sufficient by itself or as corroborated by other evidence to convince them beyond a reasonable doubt of Butler's guilt. And Instruction No. 13 was designed to direct the members of the jury that they should look to see whether there was corroboration of Coleman's testimony as to the defendant's connection with the crime and not merely as to the commission of the crime. We are entirely satisfied that the instructions, which were granted at the request of the defendant's counsel, fully and fairly protected the interests of the defendant and he is in no just position to complain about them. See *State v. Doro*, 103 *N. J. L.* 88, 94 (*E. & A.* 1926); *cf. Dennis v. United States*, 341 *U. S.* 494, 500, 71 *S. Ct.* 857, 862, 95 *L. Ed.* 1137, 1148 (*footnote 2*) (1951), rehearing denied, 342 *U. S.* 842, 72 *S. Ct.* 20, 96 *L. Ed.* 636 (1951), motion denied 355 *U. S.* 936, 78 *S. Ct.* 409, 2 *L. Ed. 2d* 419 (1958).

█ In subparagraph (a) of Point I of his brief, the defendant complains about the trial court's refusal to strike Mrs. Jaeger's testimony that her husband had kept her gift razor in his office at the plant. Her testimony was given in response to a question as to whether she knew where her husband kept the razor; at that point there was no objection or motion by counsel for the defendant but on cross-examination he brought out that Mrs. Jaeger had never actually seen the razor at the plant although her husband had taken it from his home with the comment that he was taking it to his office at the plant for use there. Defense counsel moved to strike Mrs. Jaeger's testimony "as to where the razor was on the ground that her knowledge is hearsay"; he did not move to strike Mrs. Jaeger's testimony that her husband had taken the razor from his home with the comment that he was taking it to the plant for use there. See 6 *Wigmore, Evidence* § 1725 (*3d ed.* 1940); *Annotation* 113 *A. L. R.* 268, 288 (1938). The trial court denied the motion and we fail to see how its action prejudiced the

defendant or played any material part in the verdict. The jury could not have been misled as to the pertinent facts since it was told by Mrs. Jaeger that she had never seen the razor at the plant and that all she knew was that she had given it to her husband who had taken it from their home with the aforestated comment. If the trial court had granted the motion to strike the testimony that her husband had kept the razor at the plant, the information remaining in the jury's possession would have been no different. The jury could infer from Mrs. Jaeger's remaining testimony, when coupled with the testimony of Mr. Romanetz that Mr. Jaeger kept two electric razors in his office at the plant and shaved there daily, that the gift razor was kept by Mr. Jaeger at his office; and other testimony in the case, which was properly admitted and to which no objection has been urged, permitted the jury to infer that both razors were missing immediately after the robbery and that during the night of July 19–20, 1956 the defendant brought a brown bag containing an electric razor to the house in which Granville lived and that on the morning of July 20, 1956 Mrs. White saw, on top of the refrigerator in the house, a brown bag containing an electric razor of "a light cream color."

█ In subparagraph (b) of Point I, the defendant complains about the admission into evidence of testimony by Perth Amboy Police Captain Zanzalari that Coleman had identified a knife (Exhibit S–79) as that of Bland Williams. During his direct examination Coleman had testified, in effect, that he was coerced into accompanying Butler and the others and that at that time Bland Williams had pressed a knife into his back; he identified Exhibit S–79 as the knife and stated that after the night of the robbery and killing he had seen the knife on the Captain's desk at police headquarters in Perth Amboy and had picked it up saying: "This is the knife, here that red mark on it." "That is the knife he pulled on me." Bland Williams in his testimony for the defense acknowledged that Exhibit S–79 was just like his knife except that he did not recall the red spot on it.

Captain Zanzalari testified for the State that on August 28, 1956 Exhibit S–79 was on the top of his desk at his office at Perth Amboy and that at that time Coleman was brought in by Officer Panconi of Woodbridge and that as Coleman approached his desk Coleman said "That's Bland's fishing knife." No objection or motion addressed to this testimony by Captain Zanzalari was made by counsel for the defendant but he now seeks to urge that its admission constituted plain error within *R. R.* 1:5–1. We do not view it as such (*cf. State v. Buffa,* 51 *N. J. Super.* 218, 238 (*App. Div.* 1958), affirmed 31 *N. J.* 378, 380 (1960)) and, in any event, are satisfied that, in the light of the testimony by Coleman and Bland Williams, its admission could not be said to have affected the substantial rights of the defendant or to have played any material part in the jury's verdict.

In subparagraph (c) of Point I, the defendant urges that the trial court erred in admitting Detective Panconi's testimony that "the defendant refused to answer questions as to his whereabouts at the time of the murder." The detective testified that on July 30, 1956, he and other officers took the defendant, first to the Carteret Police Headquarters and then to the Woodbridge Headquarters where the defendant was booked "as a material witness." The defendant was questioned and according to the detective he "would not even speak with us or to us"—"he wouldn't tell us a thing." At this point no objection to the testimony was made by counsel for the defendant. Continuing his testimony the detective stated that during his first interrogation of 10 or 15 minutes the defendant "didn't even speak to us" and that after being given lunch the defendant was again questioned at about 2:15 P. M. and again at 4:30 P. M. He was then asked whether on these two occasions the defendant answered any of his questions and his answer was as follows: "Well, I don't recall. The first day, on July 30, he was very uncooperative, I mean, he sat there, and he wouldn't move, and we asked him—I know I questioned him, I said, 'now Willie, tell us where you were on the night

of July 19. You tell us where you were.'" At this point counsel for the defendant for the first time voiced an objection but the court stated that it would allow the question. Thereafter the detective testified that the defendant would not answer his inquiry though he told him that, if his answer "checks out and we have people that will tell us you were with them, or wherever you were, then you are free to go." The defendant was questioned again on July 31 and the detective testified that he again refused to answer questions until late in the afternoon when he told them who his roommates were and gave him other incidental information.

All of the aforementioned testimony was given on May 28, 1959; it was not mentioned during the remainder of the State's case or during the defendant's case which included the defendant's own testimony in detail as to his whereabouts on the night of July 19–20, 1956. Counsel for the defendant never made any motion with respect to the testimony nor did he submit any request to charge with reference to it. During their summations neither counsel for the State nor counsel for the defense referred to it; counsel for the State, while stressing the State's position that the crucial testimony of Coleman was credible and referring to matters which the State had presented as corroborative, did not at any time during his summation in any wise suggest that the defendant's refusal to answer questions on July 30 and 31 was to be viewed as corroborative or that any inference adverse to the defendant was to be drawn therefrom. Similarly no reference to the defendant's refusal was made in the trial court's charge when, after completion of the lengthy trial, the case was finally submitted to the jury on June 18, 1959.

Authorities throughout the country divide on the issue of whether courts should admit evidence of a defendant's silence in the face of an accusatory statement made while he was under arrest or in custody. See *McCormick, Evidence* § 247, *p.* 529 (1954); 4 *Wigmore, supra* § 1072, *p.* 80.

Many states follow the hard-and-fast rule that such evidence is inadmissible (see *State v. Bates,* 140 *Conn.* 326, 99 *A. 2d* 133 *(Sup. Ct. Err.* 1953); *People v. Rutigliano,* 261 *N. Y.* 103, 184 *N. E.* 689 *(Ct. App.* 1933); *Commonwealth v. Anderson,* 245 *Mass.* 177, 139 *N. E.* 436 *(Sup. Jud. Ct.* 1923)); these states also exclude testimony by police officers that, while he was under arrest or in custody on a criminal charge, the defendant refused to answer questions addressed to him. See *People v. Travalo,* 309 *N. Y,* 382, 131 *N. E. 2d* 557 *(Ct. App.* 1955); *People v. Hansen,* 348 *Ill. App.* 389, 108 *N. E. 2d* 831 *(App. Ct.* 1952). Other states follow a more flexible rule which treats the arrest or custody as one of the factors to be considered in determining whether, in the light of all of the circumstances, the defendant would naturally be expected to have voiced denial of the accusatory statement or the charge against him. See *Scott v. State,* 249 *Ala.* 304, 30 *So. 2d* 689 *(Ct. App.* 1947); *Albano v. State,* 89 *So. 2d* 342 *(Fla. Sup. Ct.* 1956); *cf. People v. Simmons,* 28 *Cal. 2d* 699, 172 *P. 2d* 18 *(Sup. Ct.* 1946); *Note,* 35 *Calif. L. Rev.* 128 (1947); *Note,* 6 *U. C. L. A. L. Rev.* 593 (1959). In discussing this divided opinion among the courts, Professor Falknor has noted that the recent cases seem to manifest pretty general recognition that exclusion "has the better of the argument," citing *McGrew v. State,* 293 *P. 2d* 381 *(Okl. Cr.* 1956); *People v. Travalo, supra; Kelley v. United States,* 99 *U. S. App. D. C.* 13, 236 *F. 2d* 746 *(D. C. Cir.* 1956). See *Falknor, Evidence* 32 *N. Y. U. L. Rev.* 517 (1957).

In *Donnelly v. State,* 26 *N. J. L.* 601 *(E. & A.* 1857), the court considered whether evidence was admissible to establish that the defendant remained silent when the victim made a declaration that the defendant had inflicted the fatal blow. Justice Ogden first pointed out that if it appeared that the declaration was made when circumstances existed which rendered a reply inexpedient or improper, or that fear, doubts of his rights, or a belief that his security would be better promoted by silence than by a response, governed

the defendant at the time, then the declaration was inadmissible; the Justice then expressed the following principle which has been restated in the later New Jersey cases collected in *State v. Kobylarz,* 44 *N. J. Super.* 250, 257 (*App. Div.* 1957), certification denied 24 *N. J.* 548 (1957):

"When a matter is stated in the hearing of one, which injuriously affects his rights, and he understands it, and assents to it, wholly or in part, by a reply, both are admissible in evidence; the answer, because it is the act of the party, who is presumed to have acted under the force of truth, and the statement as giving point and meaning to the action. So, also, silence, unless it be accounted for by some of the circumstances which have been specified, or by other sufficient reasons, may be taken as a tacit admission of the fact stated; because a person knowing the truth or falsity of a statement affecting his rights, made by another in his presence, under circumstances calling for a reply, will naturally deny it, if he be at liberty so to do, if he does not intend to admit it."

Although the principle expressed in *Donnelly* has often been applied in our State to admit evidence of the defendant's silence in the face of an accusatory statement even though the statement was made while the defendant was already under arrest or in custody (see *State v. Picciotti,* 12 *N. J.* 205, 209 (1953); *State v. Landeros,* 20 *N. J.* 76, 84 (1955), *certiorari* denied, 351 *U. S.* 966, 76 *S. Ct.* 1025, 100 *L. Ed.* 1486 (1956), *habeas corpus* denied *Application of Landeras,* 154 *F. Supp.* 183 (*D. C. N. J.* 1957)) such application has recently been brought into serious question. See *State v. Kobylarz, supra; cf. Greenberg v. Stanley,* 30 *N. J.* 485, 498 (1959). In the *Kobylarz* case the defendants Bednarski and Kobylarz were arrested on a bookmaking conspiracy charge. Bednarski entered a plea of guilty and testified on the State's behalf in the proceeding against Kobylarz. The State introduced testimony indicating that Bednarski had admitted the conspiracy charge in the presence of Kobylarz and that Kobylarz at that time refused to answer any questions. Kobylarz was convicted and, although his conviction was affirmed by the Appellate Division because of the absence of prejudicial

error, Judge Jayne took occasion to point out that generally no inference of guilt should be drawn from the silence of a defendant who is under arrest or in custody. He stressed the fact that "many accused persons deliberately recognize safety in silence and are more interested in protection from eventual prosecution and conviction than in preliminary protestations of innocence"; and he indicated the Appellate Division's approval of the view that the silence of a defendant who is faced with incriminatory accusations while he is under arrest or in custody would be deemed inadmissible as evidence unless the circumstances shown are such that "no explanation of his silence is reasonable other than his acquiescence in the truth of the accusations." See 44 *N. J. Super.*, at *page* 259; *cf. McCormick, supra, pp.* 529–531.

██ In the instant matter the defendant was not confronted with any accusatory statements when he was questioned by Detective Panconi as to his whereabouts on the night of July 19-20, 1956. He simply refused to answer questions addressed to him and in so doing he acted within his rights. The defendant's silence at that time did not give rise to any inference of guilt and the trial court should have sustained the objection when it was made by defense counsel. *Cf. State v. Kobylarz, supra.* But we are satisfied the defendant was not prejudiced by the trial court's ruling. The evidence which was introduced without protest before the objection was first made had already disclosed to the jury that the defendant had been questioned by the detective and had refused to speak to him or tell him anything. The trial continued for several weeks after the detective's testimony was completed and in due course the defendant himself took the stand to tell about his whereabouts on the night of July 19-20, 1956. At no point during the trial was it asserted that the defendant was under an obligation to answer the detective's questions or that an inference of guilt should be drawn from his silence. Nowhere in the lengthy summations by counsel for the State or the defense or in the trial court's charge was any reference made to the

defendant's refusal to answer the detective's questions and we are convinced from the entire record before us that it played no material part in the jury's verdict; under the circumstances a reversal on this issue would not be warranted. See *Riger v. State*, 249 *Wis.* 201, 23 *N. W. 2d* 456 (*Sup. Ct.* 1946) ; *cf. State v. Kobylarz, supra; People v. Simmons, supra; People v. Ruligliano, supra.*

▉▉ In subparagraphs (d) and (e) of Point I, the defendant urges that "the purported corroboration of Coleman's testimony was legally meager, if not insufficient" and that the "meagerness of the purported corroboration of Coleman's story accentuates the prejudicial character of the errors in admitting incompetent, irrelevant and immaterial evidence." The alleged meagerness of the corroboration is clearly no ground for reversal in view of the settled law in New Jersey that a jury may convict upon the testimony of an accomplice alone. See *State v. Spruill, supra; State v. Carbone*, 17 *N. J. Super.* 446, 454 (*App. Div.* 1952), affirmed 10 *N. J.* 329 (1952) ; *State v. Baechlor*, 52 *N. J. Super.* 378, 398 (*App. Div.* 1958) ; *State v. Kuznitz*, 36 *N. J. Super.* 521, 531 (*App. Div.* 1955), certification denied 20 *N. J.* 136 (1955) ; *State v. Kane*, 9 *N. J. Super.* 254, 265 (*App. Div.* 1950) ; *State v. Bien*, 95 *N. J. L.* 474, 480 (*E. & A.* 1921). Many of the other states, although by no means all, apply the same rule as does New Jersey. See *State v. La Fountain*, 140 *Conn.* 613, 103 *A. 2d* 138 (*Sup. Ct. Err.* 1954) ; *State v. Hume*, 146 *Me.* 129, 78 *A. 2d* 496 (*Sup. Jud. Ct.* 1951), motion dismissed, 148 *Me.* 226, 91 *A. 2d* 672 (*Sup. Jud. Ct.* 1952), *certiorari* denied, *Humes v. State of Maine*, 345 *U. S.* 912, 73 *S. Ct.* 654, 97 *L. Ed.* 1347 (1953) ; *People v. Nitti*, 8 *Ill. 2d* 136, 133 *N. E. 2d* 12 (*Sup. Ct.* 1956) ; in the *Nitti* case the Illinois Supreme Court, in sustaining a conviction on the uncorroborated testimony of accomplices, had this to say:

"This State has always followed the common-law rule that the uncorroborated testimony of an accomplice, if it satisfies the jury

or court beyond a reasonable doubt, is sufficient to sustain a conviction of a felony. *Gray v. People*, 26 *Ill.* 344; *Rider v. People*, 110 *Ill.* 11; *People v. Niemoth*, 409 *Ill.* 111, 98 *N. E.* 2d 733; *People v. Johnston*, 382 *Ill.* 233, 46 *N. E.* 2d 967; *People v. Jurek*, 357 *Ill.* 626, 192 *N. E.* 686. We have, however, recognized that such testimony is not of the most satisfactory character and is attended with serious infirmities which require utmost caution in relying upon such evidence alone. *People v. Hermens*, 5 *Ill.* 2d 277, 125 *N. E.* 2d 500; *People v. Rendas*, 366 *Ill.* 385, 9 *N. E.* 2d 237; *People v. Hudson*, 341 *Ill.* 187, 173 *N. E.* 278. Such considerations go to the questions of the weight of the evidence or credibility of the witnesses, which questions are peculiarly the province of the jury or the court in the first instance. The jury, or the court in its stead, has opportunities not possessed by a court of review, to form a correct estimate of the credibility of witnesses and the weight of their testimony. For these reasons if the jury or the court is satisfied by the testimony of an accomplice, beyond a reasonable doubt, the judgment should not be set aside unless it is plainly apparent to the reviewing court that the defendant was not proved guilty beyond a reasonable doubt. *People v. Jurek*, 357 *Ill.* 626, 192 *N. E.* 686; *People v. Rudnicki*, 394 *Ill.* 351, 68 *N. E.* 2d 723." 133 *N. E.* 2d, at *page* 13.

The defendant concludes Point I of his brief with the contention that, in view of the meager nature of the corroboration of Coleman's testimony, "the error in the admission of the evidence as to the electric razor, the knife and the grillings at the police station cannot be viewed as harmless." But the weight of the corroborative as well as the other testimony was clearly a factual matter for the jury and the effect of the legal error alleged as to Mrs. Jaeger's testimony with respect to the razor, Captain Zanzalari's testimony with respect to the knife of Bland Williams, and Detective Panconi's testimony with respect to the interrogation of the defendant, has been specifically and sufficiently dealt with earlier in this opinion.

In Point II of the defendant's brief it is urged that "Coleman's testimony that the defendant admitted, at the time of the killing of Mr. Quackenbush, that he had killed before, was ineradicably prejudicial to the defendant." During the direct examination of Coleman the following occurred:

"Q. John, you told us before that after Mr. Quackenbush was killed, that Bland and Eugene Williams and Willie Butler then went and moved the safe out of the building. A. Yes.

Q. Was anybody drinking at that time? A. No, there wasn't nobody drinking at that time. But Willie Butler, as I tried to stop him from killing Mr. Quackenbush, he said, 'You got bad nerves.' He said, 'It ain't the first man I ever killed.' And he pulled out a pint of whisky and said, 'Here is a pint of whisky.' I said, 'No, I don't'—

Mr. Strong: I move it be stricken.

The Court: Why? It is something that Butler said to him.

Mr. Strong: Yes, sir, with reference to this not having been the first man he killed.

The Court: He is simply quoting what Butler said.

The Witness: That is in my testimony, Judge.

Mr. Strong: That part I submit is prejudicial and I move it be stricken.

Mr. Dolan: We will consent to it being stricken, that part.

The Court: All right, that will be stricken and you will disregard that in its entirety."

The isolated reference to another killing was not induced or anticipated by the prosecution; it occurred midway during the lengthy trial and in the light of the trial court's concluding action and the remaining testimony by Coleman it may fairly be considered to have had no prejudicial effect. See *United States v. Stromberg*, 268 *F. 2d* 256, 269 (2 *Cir.* 1959), *certiorari* denied 361 *U. S.* 863, 80 *S. Ct.* 123, 4 *L. Ed. 2d* 102 (1959); *cf. State v. Sinnott*, 24 *N. J.* 408, 414 (1957); *State v. Doto*, 16 *N. J.* 397, 411 (1954), *certiorari* denied 349 *U. S.* 912, 75 *S. Ct.* 601, 99 *L. Ed.* 1247 (1955). Furthermore, Coleman's statement as to what the defendant said during the course of the killing was relevant towards establishing the State's charge, in the trial now under review, that the defendant was guilty of a murder which was willful, deliberate and premeditated as well as committed during the course of a robbery (*cf.* 27 *N. J.*, at *page* 590) and could lawfully be received in evidence. See *McCormick, supra,* at *p.* 328, 330; 6 *Wigmore, supra,* §§ 1732, 1772, 1785; 2 *Warren, Homicide* § 197 (*Perm. ed.* 1938); 1 *Wharton's Criminal Evidence* § 436 (11*th ed.* 1935); *cf. State v. Sinnott, supra,* 24 *N. J.*,

at *page* 413; *State v. Donohue, 2 N. J.* 381, 388 (1949); *Dempsey v. State*, 15 *Ala. App.* 199, 72 *So.* 773 (*Ct. App.* 1916); *State v. Peppie*, 179 *Or.* 532, 173 *P. 2d* 468 (*Sup. Ct.* 1946).

In the *Sinnott* case this court, through Justice Wachenfeld, had this to say with respect to an allegation of error based on the admission of evidence which indicated the commission of a crime other than that charged in the indictment against the defendant:

"The appellant alleges error, contending that on the trial of a person for one crime, evidence that he was guilty of other crimes, even of a like nature, is irrelevant and inadmissible. *E. g., State v. DePaola*, 5 *N. J. J.* 1 (1950); *State v. Julius*, 3 *N. J. Misc.* 202 (*Sup. Ct.* 1925); *State v. Fisher*, 96 *N. J. L.* 5 (*Sup. Ct.* 1921); *State v. Bloom*, 89 *N. J. L.* 418 (*Sup. Ct.* 1916); *State v. Raymond*, 53 *N. J. L.* 260 (*Sup. Ct.* 1891). *Cf. State v. Bartell*, 15 *N. J. Super.* 450 (*App. Div.* 1951), affirmed 10 *N. J.* 9 (1952).

The reasoning based on the cases cited, however, overlooks the fact that a defendant's declarations and acts are admissible when they are part of the *res gestae. Cf. State v. Stephan*, 118 *N. J. L.* 592 (*E. & A.* 1937); *Hunter v. State*, 40 *N. J. L.* 495 (*E. & A.* 1878).

When the evidence of another crime tends to prove logically against the defendant some element of the crime for which he was tried, *cf. State v. DePaola, supra*, or where the evidence of another crime tends to show malice, ill will or intent on the part of the actor, *State v. Donohue*, 2 *N. J.* 381 (1949), or where a common scheme or plan embodies the commission of two or more crimes so related that proof of one tends to establish the other, *State v. Noel*, 102 *N. J. L.* 659 (*E. & A.* 1926); *State v. DePaola, supra; State v. Donohue, supra*, it becomes admissible." 24 *N. J.*, at *page* 413.

In its opening, the State asserted that it was proceeding on two theories, namely, (1) "that this was a willful, premeditated and deliberate murder" and (2) "that this was a felony murder, a murder committed while a robbery was under way or had been fully carried out." Without objection by the defendant, the State proceeded throughout the trial on both theories and after the case was submitted to the jury it returned its verdict of guilty of murder in the first degree, adding "felony murder and premeditated murder." There was testimony by Coleman indicating that the

defendant had said to Mr. Quackenbush that he was going to kill him because he might recognize him; this testimony was relevant towards establishing the elements of the charge of willful, deliberate and premeditated murder (see 27 *N. J.*, at *page* 590). Further evidential support of these elements may be found in Coleman's testimony that as he tried to stop the defendant from killing Mr. Quackenbush the defendant said "you got bad nerves"—"it ain't the first man I ever killed." While this last remark suggested an independent crime, it nevertheless was relevant towards establishing the elements of the charge on which the defendant was being tried, was part of the *res gestae,* and could lawfully be received in evidence. See *State v. Sinnott, supra; McCormick, supra.* In his careful discussion of the subject, Professor McCormick has suggested that even where evidence of an independent crime is admissible under the precedents, the trial court may nevertheless exercise discretion to exclude it where necessary or appropriate to insure that the defendant is being fairly tried and adjudged on the indictment against him and no other. See *McCormick, supra,* at *p.* 332. His suggestion has much force but is not significant here since the reference to another killing was not induced or anticipated by the prosecution and was stricken by the trial court with the caution to the jury that it disregard it in its entirety.

In Point III of the defendant's brief it is urged that "the court below erred in refusing to permit the defendant to cross-examine Coleman as to his competency, during and as part of the preliminary examination of Coleman thereon by the court." When Coleman was about to be called by the State, defense counsel objected to his "being sworn as a witness on the ground that he is a mental defective, untrustworthy, incredible and unworthy of belief." Defense counsel stated that he was prepared to present expert witnesses to support his position and requested that he be permitted to cross-examine Coleman with respect to his competency as a witness after the court had interrogated

him but before the experts were called. The trial judge then inquired whether he was correct in his understanding that the experts "had every opportunity of talking to Mr. Coleman" and was advised that he was correct. He then asked defense counsel whether he agreed that it was the court's responsibility to determine the competency of Coleman to testify and defense counsel responded "I agree, yes sir, as to whether Coleman can put his hand on the Bible." The trial judge then stated that he would first examine Coleman without administering any oath, would then permit the experts to testify as to the competence of Coleman, and would thereafter rule on whether defense counsel should be permitted to cross-examine Coleman prior to any ruling as to his competency.

The trial judge then questioned Coleman at some length with respect to his age, schooling and employment and general background. In response to an inquiry as to whether he knew what it is to take an oath Coleman replied "Well, when I take an oath, I am taking my word on the Bible and something might happen to me. See when I take my oath to tell the truth I don't come to the stand and take an oath to tell a lie because something bad will happen to me in the long run if I tell a lie. And I do absolutely believe in religion, understand." After the trial judge had concluded his interrogation, counsel for the defense called Mrs. Linder, a clinical psychologist, who testified that she had examined Coleman in the course of her duties at the Crownsville State Hospital in Maryland, that she found that Coleman was a "mentally defective of moderate degree," that in her opinion Coleman "knows only on a very superficial level what an oath is," and that she would consider him untrustworthy as a witness. Dr. Campden-Main, a psychiatrist called as a witness for the defense, testified that Coleman was a mental defective moderate with a mental age "somewhere between eight and ten," that there are times when Coleman "does not know the meaning of an oath," that under certain circumstances Coleman is "suggestible"

and "a captive of his belief" but that it would be more difficult for him "to lie than for you or I to lie." He expressed the opinion that Coleman's testimony, whether or not under oath, would be untrustworthy. Drs. Wechsler, Kesselman and Colley also testified for the defense that they would not consider Coleman to be a trustworthy witness although Dr. Colley expressed the belief that, in general, Coleman "would know the meaning of an oath."

In support of its position that Coleman was a competent witness the State called Drs. Metsky, Ornsteen, Matthews, Garber and Spradley. Dr. Metsky, a clinical psychologist, testified that he had examined Coleman in January 1959 and found him to be a moderate mental defective with an I.Q. of 65, that another test in May 1959 indicated an I.Q. of 71, and that he believed that Coleman had "sufficient minimal intelligence to be able to observe, recall and communicate on matters with which he is called to testify and that he understands the nature of an oath." *Cf. Noyes and Kolb, Modern Clinical Psychiatry* 329 (*5th ed.* 1958):

"The official diagnostic and statistical manual of the American Psychiatric Association classifies the degrees of intelligence defect as *mild, moderate* or *severe*. An impairment of *mild* degree is such as would be expected in a person having an I.Q. of approximately 70 to 85. *Moderate* is used for a degree of functional impairment that will require such special training and guidance as would be expected in a person having an I.Q. of 50 to 70. *Severe* refers to a degree of defect such that the individual requires custodial or complete protective care. Usually this will apply to I.Q.'s below 50. The degree of defect should not be determined solely by psychological test scores but should take into consideration cultural, physical and emotional determinants as well as school, vocational and social effectiveness. Usually a person having an I.Q. between 70 and 90 may be said to be of *borderline* intelligence."

Dr. Ornsteen, a specialist in neurology and psychiatry, testified that he had examined Coleman, had found that he could remember with "surprisingly good orientation" and could recall "details and later describe what he had seen and heard and what he did," and had concluded that Coleman "was

mentally capable and competent to give testimony in a trustworthy manner." Dr. Matthews, a specialist in psychiatry and neurology, testified that he had examined Coleman, had found him "duller than normal" but did not believe him to be "greatly inferior," that he knew the difference between right and wrong and the nature of an oath, and could be "looked upon as a competent witness." Drs. Garber and Spradley, specialists in neuropsychiatry, jointly examined Coleman in December 1958 and again in May or June 1959. Dr. Garber expressed the opinion that Coleman's "mental deficiency was not of that degree to impair his judgment or his ability to recognize the meaning of an oath, nor was it considered to be of sufficient degree to impair his testifying in a procedure of this type." He found that although Coleman demonstrated "a moderate degree of mental deficiency" he was not suffering from any form of mental illness, was "in excellent touch with his surroundings" and "had a good grasp of the material or the events that had occurred throughout his life." Dr. Spradley testified that he found Coleman to have "an excellent memory," that his emotional state was stable, that he was "perfectly oriented" and that although he was not as bright as the average man "there is no mental incapacity here that would prevent this man from telling his story as he wants to tell it, giving the details as he recalls them."

After Dr. Spradley had completed his testimony the trial court stated that it would then permit defense counsel to cross-examine Coleman as to his competency before any ruling was made on that issue. At that juncture defense counsel pointed out that he had wanted to cross-examine Coleman before the experts testified and that in his opinion "there would be nothing gained at this time by further questioning of Coleman unsworn." He stated further that "the defense therefore waives that right to question Coleman further unsworn, as your Honor has given the defense, inasmuch as we feel that the effect we felt such questions would have would now be lost, in any event." Thereupon the court

ruled that Coleman was competent to testify, expressing the view that he possessed "the necessary intelligence required to qualify as a witness," that he had "sufficient capacity to observe, recollect and communicate with respect to the matter at hand" and that "although there is some evidence which would indicate a mental deficiency" on the part of Coleman this deficiency "is not such as to render his testimony incompetent."

In this court's earlier opinion (27 *N. J.* 560) it was noted that under the law of this State the mental qualification of a person to be a witness is a matter for the discretion of the court to be exercised in the light of the following:

> "A person does not have to be entirely sound mentally in order to qualify as a witness. A certain minimal intelligence is required. He should have sufficient capacity to observe, recollect and communicate with respect to the matters about which he is called to testify, and to understand the nature and obligations of an oath. *State v. Mohr,* 99 *N. J. L.* 124, 127 (*E. & A.* 1923); 97 *C. J. S. Witnesses* § 57. Where there is evidence of mental derangement or feeblemindedness, the inquiry is whether the deficiency is sufficient to render his testimony untrustworthy. *State v. Wildman,* 145 *Ohio St.* 379, 61 *N. E.* 2d 790 (*Sup. Ct.* 1945); *State v. Webb,* 131 *N. E.* 2d 273 (*Ohio C. P.* 1955); *Wigmore, supra,* § 492, *p.* 585." 27 *N. J.,* at *page* 602

The trial judge's reception of the extensive testimony by the experts was entirely proper and in strict conformity with the views expressed in the earlier opinion. See 27 *N. J.,* at *pages* 598–606. However, nothing in that opinion dealt with the right to cross-examine Coleman before the introduction of testimony by the experts. There are authorities which indicate that the preliminary determination of competency may be made on the basis of the trial court's interrogation without cross-examination at that time. See *Ball v. State,* 188 *Tenn.* 255, 219 *S. W.* 2d 166 (*Ct. App.* 1949); *Muncie v. Commonwealth,* 308 *Ky.* 155, 213 *S. W.* 2d 1019 (*Ct. App.* 1948); *Wigmore, supra,* §§ 487, 1385. Other authorities indicate that counsel has the right of cross-examination prior to the ruling on competency. See *William M. Lloyd & Co. v. Poythress,* 185

*N. C.* 180, 116 *S. E.* 584 (*Sup. Ct.* 1923); *People v. Tanaglea,* 241 *App. Div.* 823, 271 *N. Y. S.* 1 (1934); *cf. People v. Delaney,* 52 *Cal. App.* 765, 199 *P.* 896 (*D. Ct. App.* 1921).

In our State there are earlier decisions indicating that the determination of competency may be made by the trial court entirely on the basis of its own examination. See *Den v. Vancleve,* 5 *N. J. L.* [589] 695, 765 (*Sup. Ct.* 1819); *Stale v. Mohr,* 99 *N. J. L.* 124, 127 (*E. & A.* 1923); *Stale v. Martin,* 102 *N. J. L.* 388, 394 (*E. & A.* 1926). However, these decisions also suggest the inadmissibility of extrinsic aids, an approach which was considerably liberalized by this court in its prior holding that when the competency of a witness is challenged "both parties may introduce whatever relevant evidence they have on the issue of insanity or mental weakness." See 27 *N. J.,* at *page* 603. Under this broader approach, cross-examination on the issue of competency should be permitted, in the trial court's discretion, whenever it appears that such course will aid in reaching a just and proper determination as to the competency of the witness. In the instant matter, the trial court granted ample opportunity to defense counsel to cross-examine Coleman before any ruling was made as to competency. While it determined not to permit this cross-examination before receiving the testimony of the experts, that procedural determination was well within its broad discretionary powers and did not prejudice the defendant. See *Commonwealth v. Hall,* 164 *Mass.* 152, 41 *N. E.* 133 (*Sup. Jud. Ct.* 1895); compare *People v. Curry,* 97 *Cal. App. 2d* 537, 218 *P. 2d* 153 (*D. Ct. App.* 1950), with *People v. McCaughan,* 49 *Cal. 2d* 409, 317 *P. 2d* 974 (*Sup. Ct.* 1957). The experts who testified for the defense had adequate opportunity to examine Coleman before they were called to testify and when counsel for the defense was later offered the opportunity to cross-examine Coleman he could have done so and thereafter have asked leave to recall his expert witnesses for further testimony if any occasion for such

action arose. Instead he waived the right to cross-examine then and it would appear that the defendant is now in no position to complain. In any event, it is entirely evident, not only from the extensive examination and cross-examination of the experts but also from the extensive examination and cross-examination of Coleman after he was sworn as a witness, that the defense could have gained nothing by cross-examination prior to the introduction of the expert testimony. Under the circumstances it is clear to us that the contention embraced in Point III of the defendant's brief affords no basis for reversal. *Cf. Henderson v. United States,* 218 *F. 2d* 14, 17, 50 *A. L. R. 2d* 754 (6 *Cir.* 1955), *certiorari* denied 349 *U. S.* 920, 75 *S. Ct.* 660, 99 *L. Ed.* 1253 (1955), rehearing denied 349 *U. S.* 969, 75 *S. Ct.* 879, 99 *L. Ed.* 1290 (1955) ; *Stewart v. State,* 38 *Ala. App.* 497, 88 *So. 2d* 580 (*Ct. App.* 1956).

Lastly, the defendant's brief urges in Point IV that "the errors above complained of, in their aggregate, deprived the defendant of a fair trial," citing *State v. Orecchio,* 16 *N. J.* 125, 129 (1954) where this court said:

"The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries. This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial, and in recent days this court has not hesitated to deny such relief to the defendant. See *State v. LeFante,* 14 *N. J.* 584 (1954) ; *State v. Witte,* 13 *N. J.* 598 (1953), *certiorari* denied 347 *U. S.* 951, 74 *S. Ct.* 675; *State v. Vaszorich,* 13 *N. J.* 99 (1953), *certiorari* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* 400 (1953). But *cf. Knowlton, Criminal Law and Procedure,* 8 *Rutgers L. Rev.* 78, 87 (1953). Where, however, the legal errors are of such magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury." 16 *N. J.,* at *page* 129

We, of course, adhere fully to all of the foregoing but find nothing in the record before us which suggests that the defendant was denied a fair trial; on the contrary, throughout the lengthy proceedings the trial judge exercised great care in protecting the rights of the defendant and we are satisfied that such incidental legal errors as may have crept into the trial were insubstantial and did not prejudice the defendant or render the proceedings unfair. If the crucial portion of Coleman's testimony relating to the killing is believed, then there was evidence establishing beyond reasonable doubt that the defendant was guilty; the jury in this case (as did the earlier jury) believed the testimony and since matters of credibility are within its domain rather than ours, we may not fairly upset its verdict as against the weight of the evidence. See *State v. Monahan,* 16 *N. J.* 83, 93 (1954), *certiorari* denied 348 *U. S.* 889, 75 *S. Ct.* 210, 99 *L. Ed.* 698 (1954); *State v. Landeros, supra,* 20 *N. J.,* at *page* 82; *cf. State v. Wesler,* 137 *N. J. L.* 311, 313 (*Sup. Ct.* 1948), affirmed 1 *N. J.* 58 (1948). In the *Monahan* case this court pointed out that "Under our system of jurisprudence, the responsibility of determining if the guilt of the defendant has been established beyond a reasonable doubt rests with the jury and our review of the evidence is designed only to correct injustice resulting from a plain and obvious failure of the jury to perform its function."

However, what has concerned us, and particularly those of us who seriously question the justifications of capital punishment, is that any man should be sent to his doom on the testimony of a feeble-minded person. But here again responsibility has been placed by our Legislature with the jury and although the Governor has been vested with power to commute the death sentence (*N. J. S.* 2A:167–2; *cf. N. J. Const., Art.* 5, § 2, *par.* 1) this court has no comparable power. See *State v. Mangino,* 17 *N. J. Super.* 587, 591 (*App. Div.* 1952). There was a period in history, as Wigmore has pointed out, "when the deranged and defective,

in the superstitious belief of earlier times, which regarded madness as an affliction sent from Heaven, were treated as being incapable of being witnesses at all." 2 *Wigmore, supra*, § 492. This rule of absolute exclusion prevented criminal prosecutions in many situations where the only available witnesses were mental defectives. With the abandonment of earlier superstitions and the advancement of medical knowledge, the rule of absolute exclusion has been generally replaced by the modern rule under which the trial judge in each case makes a preliminary determination as to whether the particular individual, notwithstanding his mental deficiency, has sufficient capacity for observation, recollection and communication and the minimal intelligence, as well as the basic understanding of the obligation to tell the truth, to make him a worth-while witness. See 2 *Wigmore, supra*, § 492 *et seq.; McCormick, supra*, § 62. If the preliminary determination is favorable to the competency of the witness then the jury is called upon to discharge its vital responsibility of determining, in the light of all of the pertinent evidence including that relating to his mental deficiency, whether his testimony is credible and trustworthy. See 3 *Wigmore, supra*, § 931; *McCormick, supra*, § 45. In the instant matter, the trial judge made his preliminary determination, on legally adequate evidence, that Coleman was a competent witness and there is no reason for disturbing that determination. He properly left to the jury, with suitable cautionary instructions, the credibility and trustworthiness of Coleman's testimony in the light of all of the pertinent evidence including that pertaining to his mental deficiency; and the jury, in reaching its verdict of guilty of murder in the first degree, undoubtedly found the crucial portion of Coleman's testimony relating to the killing to be credible and trustworthy. In numerous instances throughout the country, convictions of murder and other heinous crimes have been sustained on somewhat comparable testimony by mentally deficient witnesses. See *State v. Romero*, 34 *N. M.* 494, 285 *P.* 497 (*Sup. Ct.* 1930);

*White v. State,* 203 *Ga.* 340, 46 *S. E.* 2*d* 500 (*Sup. Ct.* 1948); *Flannery v. State,* 153 *Tex. Cr. App.* 36, 216 *S. W.* 2*d* 980 (*Ct. Crim. App.* 1949); *State v. Schweider,* 5 *Wis.* 2*d* 627, 94 *N. W.* 2*d* 154 (*Sup. Ct.* 1959); *State v. Leonard,* 60 *S. D.* 144, 244 *N. W.* 88 (*Sup. Ct.* 1932); *Weeks v. State,* 126 *Md.* 223, 94 *A.* 774 (*Ct. App.* 1915); *State v. Crouch,* 130 *Iowa* 478, 107 *N. W.* 173 (*Sup. Ct.* 1906); *People v. Van Allen,* 275 *App. Div.* 181, 89 *N. Y. S.* 2*d* 594 (1949); 2 *Wigmore, supra,* §§ 492, 498; *McCormick, supra,* §§ 45, 62; 97 *C. J. S. Witnesses* § 57(b), *p.* 446 (1957); *Annotation, Mental condition as affecting competency of witness,* 148 *A. L. R.* 1140 (1944); cf. *State v. Moorison,* 43·*Wash.* 2*d* 23, 259 *P.* 2*d* 1105 (*Sup. Ct.* 1953); *State v. Wrosch,* 262 *Wis.* 104, 53 *N. W.* 2*d* 779 (*Sup. Ct.* 1952); *People v. Lambersky,* 410 *Ill.* 451, 102 *N. E.* 2*d* 326 (*Sup. Ct.* 1951).

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.